16424

STATE v. WHITE
(61 S. E. (2d) 754)

*Mr. C. T. Graydon,* of Columbia, *for Appellant,*

*Mr. T. P. Taylor, Solicitor,* of Columbia, *for Respondent.*

October 31, 1950.

L. D. LIDE, Acting Associate Justice.

This is an appeal from an order of Hon. G. Duncan Bellinger, Judge of the Fifth Circuit, dated December 30, 1949, revoking the parole of the defendant, Clyde W. White, and the suspension of the sentence originally imposed upon him on May 20, 1946.

The defendant was indicted by the grand jury of the County of Richland at the May Term, 1946, of the Court of General Sessions; and the indictment contained two counts, one count charging him with having in possession on April 24, 1946, and keeping in his place of business, four pints of a certain kind of stamped whiskey and five half pints of a certain other kind of stamped whiskey, and

the other count charging him with having in possession for unlawful use of the same whiskey. The defendant pleaded guilty to the indictment as charged, and Judge Bellinger, who was then presiding, imposed a sentence upon him, dated May 20, 1946, providing for his imprisonment for a term of two years and for the payment of a fine of $150.00; but it was further provided that upon the payment of the fine of $150.00, which was duly paid, the balance of the sentence was thereby suspended, and the defendant was placed on probation for a period of five years under the supervision of the South Carolina Probation and Parole Board, subject to the applicable law; and the conditions of the probation were therein stated, the same being in accordance with Section 1038-3, Code 1942. There was included in the sentence, among the various conditions of probation, the following, designated as (c) : "Avoid persons or places of disreputable or harmful character".

The defendant continued on probation until the order of revocation, from which this appeal is taken; and in the meantime made his monthly reports to the Parole Board, which were introduced in evidence at the hearing herein; and these reports show that in the beginning he lists himself as self-employed at the "Pig Grill"; but later reports, and the evidence, show that the name was changed by him to the "White Heart", or as it is sometimes put, the "White Heart Drive-in"; and in his later reports he gives as his employer the "White Heart Drive-In", and his type of work as that of clerk. It is admitted that the Pig Grill was, and the White Heart continued as, a soda fountain and sandwich stand (or "short order" restaurant) where beer was sold, and was in the front part of a certain building which has a large back room behind it under the same roof.

An *incognito* investigation (including a raid) was made by certain law officers on the night of December 21, 1949; and as a result thereof a warrant was duly issued by J. C. Todd, Esq., Director of the Parole Board, for the arrest of

the defendant, Clyde W. White, charging him with the violation of certain conditions of his probationary sentence, dated May 20, 1946, including condition (c) above mentioned. The defendant was arrested and incarcerated upon this warrant, on the date thereof, and thereafter, to wit, on December 29th and 30th, 1949, the matter was fully heard by Judge Bellinger, and testimony was taken in behalf of the State and in behalf of the defendant, at much length, all of which is fully set forth in the Transcript of Record. At this hearing the Solicitor appeared in behalf of the State, and the defendant was likewise represented by eminent counsel. Judge Bellinger eliminated from consideration all specifications referred to in the warrant, except specification (c), which by way of repetition is: "Avoid persons or places of disreputable or harmful character".·

After argument of counsel for the respective parties, and upon consideration of the testimony, Judge Bellinger handed down his order of revocation dated December 30, 1949; and there are ten exceptions in behalf of the defendant to this order, which are summed up ·in the appellant's brief as involving three questions, each of which will be considered herein.

The general principles of the law relating to the revocation of paroles, and hearings thereon, are established by our own decisions, as well as cases from other jurisdictions, and are accurately and admirably stated in the case of *State v. Miller,* 122 S. C. 468, 115 S. E. 742, ·745, wherein the opinion was delivered by Mr. Justice Marion, and although this case related to the revocation of a suspended sentence, rather than a suspended sentence accompanied by a parole the rule is practically identical; and we quote the following extended and informative excerpt from this opinion: "The nature of the inquiry and extent of the investigation to be conducted by the court of general sessions in determining whether the condition of a. suspended sentence has been violated are matters that rest in

the sound discretion of that court. *People ex rel. Forsyth v. Monroe County Court of Sessions,* 141 N. Y. 288, 36 N. E. 386, 23 L. R. A. 856. But where the suspension is upon conditions expressed in the sentence imposed, the prisoner has a right to rely upon such conditions, and so long as he complies therewith the suspension should stand. It follows that the authority of the court of general sessions to revoke such suspension of sentence may not be capriciously or arbitrarily exercised, but should always be predicated upon an evidentiary showing of fact tending to establish violation of the conditions. Since, however, this court's authority to review the findings of a lower court upon such an issue is confined to the correction of errors of law, unless it appears that the action of the circuit court was influenced or controlled by some erroneous view of the law, or was wholly without evidence to support it (a judicial determination wholly without a supporting basis of fact being error of law), or amounted to a manifest abuse of discretion, a finding of fact by the court of general sessions as to a breach of the conditions of a suspended sentence is final."

Among other South Carolina authorities in point may be mentioned *State v. Charles,* 107 S. C. 413, 93 S. E. 134; *State v. Maes,* 127 S. C. 397, 120 S. E. 576; and *State v. Gleaton,* 172 S. C. 300, 174 S. E. 12. The *Gleaton case* definitely settled the law to the effect that the defendant is not entitled to a jury trial.

We also quote the following from the excellent opinion by Chief Justice Hughes in the United States Supreme Court case of *Burns v. United States,* 287 U. S. 216, 53 S. Ct. 154, 156, 77 L. Ed. 266 (Federal probation and parole being essentially similar to ours) : "The question, then, in the case of the revocation of probation, is not one of formal procedure either with respect to notice or specification of charges or a trial upon charges. The question is simply whether there has been an abuse of discretion and is to be determined in accordance with familiar principles

governing the exercise of judicial discretion. That exercise implies conscientious judgment, not arbitrary action. *The Styria v. Morgan,* 186 U. S. 1, 9, 22 S. Ct. 731, 46 L. Ed. 1027 [1033]. It takes account of the law and the particular circumstances of the case and is 'directed by the reason and conscience of the judge to a just result.' *Langnes v. Green,* 282 U. S. 531, 541, 51 S. Ct. 243, 247, 75 L. Ed. 520 [526]. While probation is a matter of grace, the probationer is entitled to fair treatment, and is not to be made the victim of whim or caprice."

It should be mentioned here that while counsel for the defendant vigorously urges that the trial Judge committed errors in the revocation of the defendant's parole, there is no charge that the defendant was denied due process of law; for on the contrary, it is frankly and appropriately conceded that the "trial judge was most scrupulous in observing the legal forms and technical requirements of the law", and that he very properly limited the hearing "to the matters charged in the warrant and refused to allow the Solicitor to make any amendments".

The facts of the case will be more fully referred to in the discussion of the appellant's questions, but in order that the background of the case may be understood, it should be said that the evidence shows that the building, to which reference has hereinbefore been made, is situated near the gate of the State Fair Grounds in the proximity of Columbia, and that under the same roof there is at the front thereof the restaurant, which was operated by the defendant, and for which he paid a rental of $75.00 per month; and that directly back of this restaurant, there is a large room which was equipped and constantly used for gambling purposes; and at the time of the investigation above mentioned, and the raid incident thereto, was being operated by one Bill Huff. There was an entrance from the restaurant to the gambling room through a hall and a door entering the room; and there was another door entering the gambling room from the outside. There

was also, to the rear of the gambling room, what is designated in the testimony as the kitchen; at the back of which it was testified that the defendant stored the beer used by him in connection with the restaurant. And connected with the kitchen was a private dining room.

We come now to the first question posed in the appellant's brief, which is as follows:

1. *Was there sufficient evidence that the defendant failed to avoid "persons or places of disreputable or harmful nature" to warrant a revocation of the defendant's probation?*

As we have already stated, the issuance of the warrant for the revocation of the parole immediately arose out of an investigation which was made by the South Carolina Probation and Parole Board of the defendant's place of business and the surroundings thereof, on the night of December 21, 1949. Those who participated in this investigation included J. Curtis Moore, Supervisor of the Parole Board, and J. C. Todd, Director thereof, together with five employees of the Parole Board and two members of the State Constabulary, all of whom testified in behalf of the State at the hearing. The witnesses in behalf of the defendant were himself, and his wife, and Julian C. Hooker, who was employed by the defendant in the operation of the restaurant. And while the testimony is rather voluminous, there is after all relatively little conflict in the same.

The testimony of the officers need not be set out in detail, but specific reference will be made to the testimony of Louie E. Smith, one of the probation officers, stationed at Greenville, who spent some time in the restaurant on the night of the investigation, December 21, 1949. He gives a detailed description of the restaurant and its equipment, and at the time he was in the place the employee, Hooker, was in charge, and the defendant was not present. The witness further testified that he saw Hooker deliver whiskey to certain people and receive the money for the same, and that there were three sales thus made, that is to say, that "within

ten minutes, three pints were sold". It should be stated here, however, that the officers were unable to find any whiskey stored on the premises, although they made due search for the same.

The following is quoted from the testimony of the witness Smith, referring to what occurred in the restaurant:

"Q. All right, now, did you observe anything else going on up in the front of the place? A. I noticed several people going toward the back, and I mentioned something about it, and in the meantime, Mr. Hooker and myself became very friendly, in fact, we were telling jokes, and I said, 'Where did all the people go?' He said, 'In the back,' and a man who was about drunk said, 'Don't go back there.'

"Q. He said that to you? A. Yes, sir. I said, 'Why?' He said 'They play poker, and you will lose your money.' I said, 'Well I don't play poker,' and Mr. Hooker said, 'You can go back, if you like.' Anyway, that's what I did. I went, at his invitation, into the back room."

Officer Smith also testified that upon entering the gambling room he found that poker was being played for money, and that gambling was actively going on at the poker table. He also describes a dice table in the room and says there was no one there at that time. But other witnesses testified that later in the evening the dice table was also being used for gambling purposes. Officer Smith also testified that when he went into the room there were twenty to thirty people therein; and there is evidence to the effect that thereafter numerous persons, charged with gambling on this occasion were arrested; and that the operator of the gambling "den" was also himself arrested.

The testimony of Officer Smith was corroborated by the testimony of other officers, and many additional details were given by them.

As above indicated, Julian C. Hooker, the defendant's employee, testified in his behalf; and in the course of his tes-

timony he explicitly denied that he had sold any whiskey in the restaurant on the night of the investigation, as charged by the officers, but he says "there were several people drinking whiskey in there" which they brought with them. And the following testimony by this witness relating to the gambling room is quite significant:

"Q. So, then, you knew, and you had to know—now, Hooker, I don't care whether you say you did or didn't, but you knew in the front end that gambling and all was going on in the back. You even knew who ran it, didn't you? A. Yes, sir, Bill Huff ran it.

"Q. So, you knew it, just as an employee. A. Yes, sir.

"Q. You knew that in the back there, they were having those gambling tables, this dice table and poker table and all like that going on, certainly, since 1948, periodically, didn't you? A. Yes, sir.

"Q. And even before that, before 1948— before this raid (a previous raid) we have been talking about—that gambling table and all has been in the back, off and on, all the time, hasn't it? A. Yes, sir, off and on.

"Q. And that gambling den is connected with where you are working by a hallway, and a door opening right into the gambling place—that's right, isn't it? A. Yes, sir."

Upon the night of the investigation on December 21, 1949, the defendant was not in the restaurant, but his probation reports show that he worked "some at night, and also some in the day time" at this place. He was present, however, in the gambling room on that night for a brief time, for the testimony is undisputed that he and his wife, together with another lady and the owner of the building, walked through the gambling room, and went into the private dining room, where they ate supper together. The testimony further shows that at the time the defendant and those accompanying him passed through the gambling room, the unlawful poker game was "in full swing"; and this incident illustrates the defendant's tolerance of the neighboring lawless business. At the

conclusion of the investigation the defendant was arrested upon the warrant hereinbefore mentioned.

It should be borne in mind that the defendant is not charged with any violation of the criminal law; specifically, he is not charged with participation in the operation of the gambling hall, but he is charged with failing to avoid "persons or places of disreputable or harmful character". And it should be noted that the word "avoid" is no passive or negative term, but is positively imperative as is indicated by the definition thereof taken from the Century Dictionary, as follows: "To shun; keep away from; eschew: as to *avoid* expense, danger, or bad company."

The evidence is plenary that there was friendly propinquity between the restaurant and the gambling room; and it may readily be inferred that each of these establishments profited by patrons going from one to the other.

In fact, the testimony of the defendant himself at the hearing, however reluctant it may appear, is sufficient to establish his violation of his parole. In addition to his examination by counsel, he was interrogated at some length by Judge Bellinger, and the following is quoted from this part of his testimony:

"Q. Now, Mr. White, you knew this was a gambling place back of your place of business, didn't you? A. Yes, sir, I reckon, I did.

"Q. Oh, you know you did, don't you? A. Yes, sir.

\* \* \*

"Q. Your place of business did serve customers coming from that gambling room into your place, didn't it? A. I reckon, they did.

"Q. You know they did, don't you? A. We serve the Drive-In Theater people, too.

"Q. You knew you were serving gamblers, too, didn't you? A. Not me, myself. I wasn't there when they were gambling.

"Q. Never, at any time? A. As far as staying there and working regular, no, sir.

"Q. I asked you if at any time you served gamblers from your place. A. I don't know for sure. I might have.

"Q. Oh, you do know. Don't you know those people who frequent that gambling place? A. As far as knowing them personally, and calling them by name, I couldn't to save my life.

"Q. Well, I will put it .this my way: Don't you know' they gamble back there, and you have served those gamblers? A. I have served people that went in the back."

The second question is as follows:

2. *Did the evidence show' that the probationer had violated the terms of his probation as set out by the probation officers?*

The meaning of this question seems to be that the defendant seeks to justify his violation of his parole upon the theory that the probation officers failed in the performance of their duty to him, because they did not warn him of the surrounding conditions, particularly with reference to the gambling place; but the record clearly shows, we think, that the defendant himself had full knowledge thereof, and required no warning from the officers; and hence it is unnecessary for us to determine the extent of the duty of probation officers in this respect. And it should be especially noted here that the defendant himself admits that at the time he was placed on parole Judge Bellinger carefully explained to him the meaning of each of the conditions thereof, which as the Court stated was in accordance with his established custom, —a practice which we commend.

It appears that at the time the defendant was placed on probation the probation officer in charge was a Mr. McLeod, who was not in this service at the time of the hearing and did not testify. Indeed, the defendant sought by his testimony to make it appear that Mr. McLeod authorized his tolerance

of the gambling place, but when he purported to state just what Mr. McLeod said, he testified as follows:

"Q. Did Mr. McLeod write out your probation papers? A. I don't remember his name, but the probation man wrote it out.

"Q. Did you tell him what you were doing? A. Yes, sir, I told him I was there, and if he thought I would get in trouble, I would give it away before I would serve two years, and he said, 'Mr. White, as long as you are running the place, selling beer and sandwiches, and anything that's legal, you can do anything that anybody else can do that's legal.' "

This language does not bear the interpretation sought to be given to it. Besides, the defendant's theory in this connection is eliminated by his own statement made to Judge Bellinger, which was, "when I was put on probation, there wasn't any gambling going on in that place."

The third and last question is as follows:

3. *Did the Trial Judge err in basing the revocation of the defendant's probation on hearsay testimony, matters not in the record and issues beyond the scope of the charges brought against the probationer?*

This question is explained to some extent in the appellant's brief, wherein it is charged that three or four of the officers testified with regard to the reputation of the place where the defendant worked, and the implication is that this was hearsay testimony and hence incompetent. But an examination of the record will show that *no objection was interposed to the testimony as to reputation.* There was indeed objection made by defendant's counsel with reference to the statement of one of these witnesses that his office had received several calls in regard to the White Heart, and the Court promptly ruled that no testimony could be given as to the nature of these calls. The Judge said, "don't go into that"; and his ruling was obeyed. As already stated, there was no objection to the testimony as to reputation, and properly so, because the specification of probation violation in-

volved here refers to "disreputable" places and persons; so that reputation was competent by analogy to cases involving a criminal nuisance.

There was, however, one item of testimony which was clearly of a hearsay character, to wit, the testimony of Director Todd relating to information, which he states was received by him from certain officers, that another officer said in effect that the place where the defendant worked was under the protection of a County official. Counsel for the defendant objected to this testimony. But the following quotation from the record shows that Judge Bellinger, while he did not strike out the testimony, limited its application, so that it could not be regarded as prejudicial to the defendant:

*"The Court:* The question was as to the White Heart.

*"Mr. Graydon:* I just say, I don't want it to be construed as being against my client.

*"The Court:* No, I am taking the place, as I understand, the White Heart."

Counsel for the defendant in his brief, discussing the third question, also refers in general terms to some other testimony which he characterizes as hearsay or otherwise incompetent, but to which we find that no objection was made at the hearing. And our conclusion is that no prejudicial error can be imputed to the trial Judge, even if we applied the strict rules of the common law, although it is generally and properly recognized that in an investigation of this character, questions of evidence are especially subject to the discretion of the trial Judge.

Reference is also made by counsel to the extended remarks of Judge Bellinger in connection with his ruling, prior to the handing down of his order, from which this appeal is taken; and it is quite clear that he denounced lawlessness in no uncertain terms, and emphatically condemned existing evil conditions. But his remarks do not warrant the inference

that he based the revocation of defendant's probation upon matters *dehors* the record or beyond the scope of the hearing.

We think the record shows that the defendant was accorded his rights in every respect at the hearing upon the warrant charging him with violating his parole, and that the conclusion of the Presiding Judge is amply sustained by the evidence before him, and that he properly exercised his judicial discretion; although of course it is always a matter of regret that it must be adjudged that one like the defendant, notwithstanding his excellent war record, has failed to avail himself of the opportunity extended to him by grace, under the law, to avoid further punishment for a criminal offense of which he was admittedly guilty.

All the questions raised by the appellant are answered adversely to his contention, and all his exceptions are overruled. The order of the Circuit Court is therefore.

Affirmed.

BAKER, C. J., and STUKES, TAYLOR and OXNER, JJ., concur.