692 S.E.2d 516

Charles WARD and Robby Hodge, d/b/a
R & B Amusements, Petitioners,

v.

WEST OIL COMPANY, INC., d/b/a
Markette Stores, Respondent.

No. 26797.

Supreme Court of South Carolina.

Heard March 3, 2010.
Decided April 12, 2010.

Charles E. Carpenter, Jr. and Carmen V. Ganjehsani, both of Carpenter Appeals and Trial Support, of Columbia, D. Kenneth Baker, of Darlington, for Petitioners.

Martin S. Driggers, Jr. and William R. Calhoun, Jr., both of Sweeny, Wingate & Barrow, of Columbia, for Respondent.

Justice BEATTY.

In this contract dispute case involving "pull-tab" game machines, this Court granted the petition of Charles Ward and Robby Hodge, d/b/a R & B Amusements ("R & B") for a writ of certiorari to review the Court of Appeals' decision in *Ward v. West Oil Co.*, 379 S.C. 225, 665 S.E.2d 618 (Ct.App.2008), in which the Court of Appeals affirmed the special master's award of $5,067.31 in damages to R & B for its breach of contract action against West Oil Company, Inc., d/b/a Markette Stores ("West Oil"). Because we find the parties' contract is void *ab initio*, we vacate the decisions of the special master and the Court of Appeals and dismiss with prejudice R & B's breach of contract action.

## I. Factual/Procedural History

Charles Ward and Robby Hodge own and operate R & B, which provides games and gambling machines to businesses. In September 2001, they sought to place "pull-tab" game machines [1] in Markette convenience stores owned by West Oil. The machines sold tickets, called "Pots of Gold," with the potential for winning prizes. On September 11, 2001, Ward and Hodge met with Alexander West, Jr. (West), the President of West Oil, and Camp Segars (Segars), the Director of Operations for West Oil, to discuss placing machines in a number of Markette stores.

At the meeting, Ward and Hodge gave West Oil an overview of the machines and presented West Oil with a form contract, which they had obtained from their "pull-tab" machine supplier. The typewritten contract consisted of eleven paragraphs. As part of the agreement, West Oil agreed to initially place the machines at four of its convenience stores. During the remaining discussions, the parties negotiated the following changes to the contract: (1) the payout scheme; (2) a reduction of the term of the contract from three years to one year;

---

1. A "pull-tab" ticket has been defined as: "[a] small, two-ply paper card, a pull-tab bears symbols and patterns similar to tic-tac-toe that appear when players peel off the pull-tab's top layer. The pattern of the symbols determines whether the player wins a prize ... Pull-tabs are sold from large pools know as 'deals.' " *Diamond Game Enters., Inc. v. Reno*, 230 F.3d 365, 367 (D.C.Cir.2000) (addressing the legality of "pull-tab" cards and machines).

and (3) a requirement that R & B pay West Oil a $500 up-front placement fee for each machine that they installed. R & B also agreed to absorb the $180 cost of the tickets in the machines.

On September 13, 2001, Ward, Hodge, and Segars met to execute the contract. Ward and Hodge had revised the contract to conform to the parties' discussions during the initial meeting. Paragraph 7 of the typewritten contract provided for liquidated damages in the event of a breach. Segars added a handwritten provision to the top of the contract that was initialed by Segars, Hodge, and Ward. This provision stated:

Addition * In [the] event of contract termination, up front placement money will be re-imbursed [sic] at pro-rated time with no penalties to either party of this contract. This is added this day September 13th 2001.

Within two days of signing the contract, R & B placed the machines in four Markette stores, as specified in the contract. Because these machines performed well, the parties orally agreed to place machines in thirteen additional stores. With the placement of each machine, R & B paid West Oil the agreed-upon placement fee of $500.

Initially, each ticket machine held a total of $4,800 worth of "red" tickets at a time. After the red tickets sold out, R & B would remove the proceeds, pay the portion due to West Oil, and refill the machine with red tickets.[2]

In late 2001, R & B approached Segars to discuss changing the game from red tickets to "green" tickets known as "Jackpots," which had different values and payouts. Segars agreed to allow R & B to change from red tickets to green tickets at one store with the stipulation that if the new cards were successful, he would consider changing the cards in all of the stores.

In February 2002, in a meeting of store managers, Segars and West discovered that R & B had replaced the red tickets with green tickets in several store locations other than the

---

2. Ward explained that there are 4,800 tickets in a box. Once the tickets are sold, R & B collects a $1,510 profit which is reduced by a $180 cost for the cards. The parties then equally divided the remaining profit.

originally-designated store. After Segars told West that he had only authorized R & B to replace the cards in the one store, West became angry and told Segars that he wanted all of the machines removed from all of the stores. West instructed Segars to leave the meeting to phone R & B and direct them to remove their machines from all West Oil stores. With thirty-one weeks remaining on the contract, R & B complied with West Oil's request and removed the machines.

Shortly thereafter, R & B filed suit against West Oil for breach of contract. The parties consented to have the matter decided by a special master. Following a bench trial, the special master issued a written order in which he concluded:

The court finds that a written, enforceable contract existed for the initial four ticket machines. The contract was terminated. Under the handwritten Addition to the contract: "In the event of contract termination, up front placement money will be reimbursed at pro-rated time with no penalties to either party of this contract." The up front placement money was $500 per machine. This also applied for the thirteen additional machines that were added at other locations. Therefore, [R & B] initially paid [West Oil] $8,500 in up front placement money. Under [R & B's] calculations, the machines were in place for twenty-one weeks. Therefore, [R & B][is] entitled to be reimbursed the pro-rated portion of the up front placement money, which equals $5,067.31.

In a unanimous decision, the Court of Appeals affirmed the special master's order in its entirety. *Ward v. West Oil Co.*, 379 S.C. 225, 665 S.E.2d 618 (Ct.App.2008). After the Court of Appeals denied R & B's petition for a rehearing, this Court granted R & B's petition for a writ of certiorari.

## II. Discussion

### A.

In our order granting R & B's petition for a writ of certiorari, we directed the parties to brief the question of whether the "pull-tab" game machines at issue in this case constitute illegal gambling devices under section 12–21–2710 of the South Carolina Code. This section provides in pertinent part:

It is unlawful for any person to keep on his premises or operate or permit to be kept on his premises or operated within this State any vending or slot machine, or any video game machine with a free play feature operated by a slot in which is deposited a coin or thing of value, or other device operated by a slot in which is deposited a coin or thing of value for the play of poker, blackjack, keno, lotto, bingo, or craps, or any machine or device licensed pursuant to Section 12–21–2720 and used for gambling or any **punch board,** *pull board,* **or other device pertaining to games of chance of whatever name or kind,** including those machines, boards, or other devices that display different pictures, words, or symbols, at different plays or different numbers, whether in words or figures or, which deposit tokens or coins at regular intervals or in varying numbers to the player or in the machine, **but the provisions of this section do not extend to** coin-operated nonpayout pin tables, in-line pin games, or to automatic weighing, measuring, musical, and **vending machines which are constructed as to give a certain uniform and fair return in value for each coin deposited and in which there is no element of chance.**

S.C.Code Ann. § 12–21–2710 (2000) (emphasis added).[3]

▪ "The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." *Hodges v. Rainey,* 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). If a statute's language is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation and the Court has no right to look for or impose another meaning. *Miller v. Doe,* 312 S.C. 444, 447, 441 S.E.2d 319, 321 (1994).

▪ "All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute." *Broadhurst v. City of Myrtle Beach Election Comm'n,* 342 S.C. 373, 380, 537 S.E.2d 543, 546 (2000). The Court should give words their plain and ordinary meaning,

---

**3.** Section 12–21–2710 was amended by Act No. 125, 1999 S.C. Acts 1319, which became effective on July 1, 2000. The parties executed their contract on September 13, 2001.

without resort to subtle or forced construction to limit or expand the statute's operation. *Sloan v. S.C. Bd. of Physical Therapy Exam'rs*, 370 S.C. 452, 469, 636 S.E.2d 598, 607 (2006).

**B.**

As a threshold matter, R & B contends that any challenge as to the legality of the "pull-tab" cards and machines should not be considered by this Court given this issue was not previously raised or ruled upon during the course of the proceedings.

Although R & B correctly references our appellate court rules regarding error preservation,[4] we find these rules are inapplicable as this Court will not "lend its assistance" to carry out the terms of a contract that violates statutory law or public policy. *See McMullen v. Hoffman*, 174 U.S. 639, 654, 19 S.Ct. 839, 43 L.Ed. 1117 (1899) ("The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract."); *White v. J.M. Brown Amusement Co.*, 360 S.C. 366, 371, 601 S.E.2d 342, 345 (2004) ("The general rule, well established in South Carolina, is that courts will not enforce a contract when the subject matter of the contract or an act required for performance violates public policy as expressed in constitutional provisions, statutory law, or judicial decisions."); *Beach Co. v. Twillman, Ltd.*, 351 S.C. 56, 64, 566 S.E.2d 863, 866 (Ct.App.2002) (holding that illegal contracts are void and unenforceable, such that actions for its breach may not be maintained).

Because this Court will not enforce an illegal contract, we find the question regarding the legality of the "pull-tab" cards and machines is appropriate for this Court's review. *See Hyta*

---

**4.** *See Pye v. Estate of Fox*, 369 S.C. 555, 564, 633 S.E.2d 505, 510 (2006) (recognizing that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved).

*v. Finley*, 137 Idaho 755, 53 P.3d 338, 340–41 (2002) (holding, in a partnership dissolution action involving a bar that primarily profited from illegal gaming machines, appellate court could *sua sponte* raise issue of whether underlying contract was illegal); *Parente v. Pirozzoli*, 87 Conn.App. 235, 866 A.2d 629, 635 (2005) (" 'It is generally true that illegality of a contract, if of a serious nature, need not be pleaded, as a court will generally of its own motion take notice of anything contrary to public policy if it appears from the pleadings or in evidence, and the plaintiff will be denied relief, for to hold otherwise would be to enforce inappropriately an illegal agreement.' " (quoting 6 Richard A. Lord, *Williston on Contracts* § 12:5 at 56–64 (4th ed.1995))); *see also* 17A Am.Jur.2d *Contracts* § 323 (2004) ("[I]f a question of illegality develops during the course of the trial, a court must consider that question, whether pleaded or not.").[5]

## C.

■ Having determined the issue is properly before us, we now address the merits of the legality question. Applying the above-outlined rules of statutory construction in conjunction with this Court's decision in *Sun Light Prepaid Phonecard Co. v. State*, 360 S.C. 49, 600 S.E.2d 61 (2004), we find the "pull-tab" cards and game machines constituted illegal gambling devices under section 12–21–2710.

In *Sun Light*, the Sellers of pre-paid, long distance telephone cards and dispensers brought suit against the State following the State's seizure of the cards and dispensers. The State had seized these items on the ground they constituted illegal gambling devices under section 12–21–2710. *Id.* at 51, 600 S.E.2d at 62.

---

5. In *Armstrong v. Collins*, 366 S.C. 204, 224, 621 S.E.2d 368, 378 (Ct.App.2005), the Court of Appeals declined to rule on the legality of a contract given the Appellant failed to raise this issue to the trial court. However, we find *Collins* is distinguishable from the instant case. Here, the contract is potentially void *ab initio* in that its enforcement would violate statutory law and, in turn, public policy. In contrast, the legality of the contract in *Collins* was potentially voidable on the ground it may have violated a bank's security agreement. Unlike the instant case, there were no public policy concerns in *Collins*.

In the declaratory judgment hearing to determine the legality of these items, the testimony established that the phone cards, including the game pieces, were pre-printed by the manufacturer before they were placed in the "Lucky Shamrock" dispenser. The dispenser could not work without a roll of phone cards inside. The dispensers were housed within a standard slot machine cabinet and contained several features present in a gambling machine as opposed to a vending machine. *Id.* at 51–52, 600 S.E.2d at 62–63.

The phone cards were printed on rolls containing 7,500 cards. Attached to each phone card was a game piece that gave the customer a chance to win a cash prize. The entire card contained a paper cover, which, when pulled back revealed a toll-free number and pin number for activating the phone service as well as an array of nine symbols in an "8–liner" format. If the game piece contained symbols arranged in a certain order, the customer would win a prize. The computer that printed the cards randomly generated winners on the cards. *Id.* at 51, 600 S.E.2d at 62. Each card sold for $1.00 and gave the customer two minutes of long distance telephone service. *Id.* at 52, 600 S.E.2d at 63.

At the conclusion of the declaratory judgment hearing, the circuit court held the phone cards and dispensers were illegal gambling devices. *Id.* at 51, 600 S.E.2d at 62. On appeal, this Court affirmed the circuit court's order.

In so holding, this Court specifically analyzed and applied the provisions of section 12–21–2710. *Id.* at 54–55, 600 S.E.2d at 64–65. In terms of the phone cards, this Court found "[t]he phone card itself contains an element of chance and is a type of gambling device known as a pull-tab," which is illegal under section 12–21–2710. *Id.* at 54, 600 S.E.2d at 64. The Court noted that "the phone portion of the cards is mere surplusage to the game piece." *Id.* at 55, 600 S.E.2d at 64.

The Court went on to reject the Sellers' argument that the phone card dispensers were legal under section 12–21–2710 given they are similar to traditional vending machines and provide a uniform return for every dollar inserted. Because the phone card rolls were an integral part of the machine and present the element of chance in the dispensers, the Court

found the dispensers violated section 12–21–2710. *Id.* at 54, 600 S.E.2d at 64.

Additionally, the Court recognized that the phone card dispensers resembled slot machines and not traditional vending machines that are exempted from section 12–21–2710. *Id.* at 55, 600 S.E.2d at 64. The Court explained that the dispensers had a gambling-themed video screen, played celebration music when a customer won, had a lock-out feature which froze the operation of the machine when a predetermined level of prize money was reached, contained a meter that records the value of the prizes paid out, and did not give change. *Id.*

Finally, because the game pieces were not a "legitimate promotion or sweepstakes," the Court found the dispensers and phone cards were not exempt under section 61–4–580 [6] of the South Carolina Code. *Id.* at 56, 600 S.E.2d at 65.

Applying the foregoing to the facts of the instant case, we hold the "pull-tab" cards and the game machines constitute illegal gambling devices under section 12–21–2710 as interpreted by this Court in *Sun Light*.

Significantly, at no point during these proceedings has R & B disputed that the game cards at issue in this case are "pull-tabs." Unlike the phone cards in *Sun Light*, the cards were

---

6.   At the time *Sun Light* was decided, section 61–4–580 provided in relevant part:

No holder of a permit authorizing the sale of beer or wine ... may knowingly commit any of the following acts upon the licensed premises covered by the holder's permit:

. . . .

(3) permit gambling or games of chance except game promotions including contests, games of chance, or sweepstakes in which the elements of chance and prize are present and which comply with the following:

(a) the game promotion is conducted or offered in connection with the sale, promotion, or advertisement of a consumer product or service, or to enhance the brand or image of a supplier of consumer products or services;

(b) no purchase payment, entry fee, or proof of purchase is required as a condition of entering the game promotion or receiving a prize; and

(c) all materials advertising the game promotion clearly disclose that no purchase or payment is necessary to enter and provide details on the free method of participation.

S.C.Code Ann. § 61–4–580 (Supp.2003).

not attached to any promotional item or thing of value. Thus, the sole function of the "Pots of Gold" and "Jackpot" game cards was to provide a game of chance, in the form of a cash prize, to players who deposited a dollar in the card dispenser.

Although the card dispensers did not resemble "slot machines" as those at issue in *Sun Light,* we find this fact is not dispositive. We hold the card dispensers and the cards were intrinsically connected in a way that deemed them illegal under this Court's decision in *Sun Light.*

As in *Sun Light,* the "pull-tab" cards created an element of chance when placed in the dispenser. As testified to by Ward, each dispenser contained 4,800 game pieces that were "pre-rated." He explained that certain cards were designated as "winners" of various sums of money. Therefore, the payout amount and profits were predetermined by a deck of cards placed in the dispensing machines. The machine was designed to payout $3,350 per deck of game cards, which translated into a 69.8 payout percentage. The "Pots of Gold" game had one $1,000 winner and the "Jackpot" game had two.

Furthermore, as described by R & B in its brief, there was an element of chance in the customer's selection of the tickets in that the dispenser contained eight columns or stacks of tickets. Under each column, there is a selector button which is pushed to receive a ticket. Thus, there is an added level of chance in terms of which column is selected.

Therefore, we conclude the "pull-tab" game machines constituted illegal gambling devices under section 12–21–2710. *See* 38 C.J.S. *Gaming* § 10 (Supp.2010) (defining "gambling device" and stating: "[a]n apparatus is a gambling device where there is anything of value to be won or lost as the result of chance, no matter how small the intrinsic value"; "they are gaming devices if used or intended for gaming, but otherwise they are not, and generally the courts will look behind the name and style of the device to ascertain its true character"); *State v. 158 Gaming Devices,* 304 Md. 404, 499 A.2d 940, 951 (1985) ("The three elements of gambling—consideration, chance and reward—are thus clearly present in a device which, for a price, and based upon chance, offers a monetary or merchandise reward to the successful player.").

Additionally, we disagree with R & B's argument that the decision in *Sun Light* should not be determinative of the

instant case. In essence, R & B claims that it could not have anticipated the result in *Sun Light* at the time it entered into the contract with West Oil. Consequently, it should not be precluded from pursuing its breach of contract action against West Oil.

Section 12–21–2710 clearly provides that "pull boards," *i.e.,* "pull-tabs," constitute illegal gambling devices. Unlike the phone cards in *Sun Light,* there is no dispute that the cards at issue were strictly "pull tabs" given there was no attached promotional item or thing of value. Thus, because section 12–21–2710 became effective approximately one year before the parties entered into the contract, R & B was not required to be clairvoyant regarding the legality of the "Pots of Gold" or the "Jackpot" tickets. Furthermore, in view of the existence of this statute, we do not believe R & B can legitimately claim reliance on the assurances of their "pull-tab" game supplier that the cards and dispensers were legal.[7]

Finally, we reject R & B's contention that West Oil will unjustly profit if the parties' contract is deemed illegal. Specifically, R & B claimed at oral argument that West Oil will be absolved of its contractual obligations even though it retained the profits from the sale of the "pull-tab" cards. Admittedly, a decision to void the contract eliminates the parties' obligations under the contract. However, both parties equally benefited financially from the division of the ticket proceeds prior to the termination of the contract.

Based on our determination that the "pull-tab" cards and the dispensers constituted illegal gambling devices, we find the underlying contract is void *ab initio* and unenforceable as it violates statutory law and public policy. Thus, we will not enforce this contract. *See Berkebile v. Outen,* 311 S.C. 50, 54 n. 2, 426 S.E.2d 760, 762 n. 2 (1993) (recognizing that an illegal contract has always been unenforceable and that South Carolina courts will not enforce a contract which is violative of public policy, statutory law or provisions of the constitution).[8]

---

7. In support of its argument, R & B references several exhibits that involve prior civil litigation and criminal proceedings.

8. In view of our ruling, we need not address R & B's remaining arguments regarding the Court of Appeals' interpretation of the instant

As a result, we vacate the decisions of the special master and the Court of Appeals and dismiss with prejudice R & B's breach of contract action.

**VACATED AND DISMISSED.**

Acting Chief Justice PLEICONES, HEARN, J., and Acting Justices JAMES E. MOORE and STEVEN H. JOHN, concur.

---

contract. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).