**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

1 Dragon's Ascent Video Gaming Machine; SC Games of Skill, LLC; Respondents,

v.

South Carolina Law Enforcement Division, Appellant.

Appellate Case No. 2023-000783

Appeal From Berkeley County
Bentley Price, Circuit Court Judge

Opinion No. 6098
Heard November 7, 2024 – Filed February 5, 2025

**REVERSED**

Adam L. Whitsett, of Columbia, for Appellant.

Peter Michael McCoy, Jr., of McCoy Law Group, LLC, of Charleston; Kirsten Elena Small, of Maynard Nexsen, PC, of Greenville; Christopher John Murphy, of Murphy Crantford Meehan, Attorneys at Law, LLC, of Summerville; and William W. Wilkins, of Billy Wilkins Law LLC, of Greenville, all for Respondents.

**HEWITT, J.:** This case concerns a "Dragon's Ascent" video game machine. The South Carolina Law Enforcement Division (SLED) confiscated the machine from a business in Hanahan after deciding it was an illegal gambling device. A magistrate found the device to be a game where skill predominated over chance but still concluded the device was illegal under South Carolina law because it was "used for

gambling."  The game and its owner (Respondents) appealed to the circuit court. The circuit court agreed the game was one of skill but found this meant the machine was legal based on the view that legality under the relevant statute "begins and ends" with the skill versus chance inquiry.  SLED appealed to this court.

The sole issue before us is whether the statute in question—section 12-21-2710 of the South Carolina Code—only prohibits games of chance or also prohibits machines and devices that can be used for gambling.  The statute's text, its history, and precedent all strongly support the latter view.  For those reasons, we reverse.

## BACKGROUND

After SLED received a complaint about an illegal gambling device being used at a Hanahan restaurant/bar, "LG's By the Creek," a special agent conducted three separate undercover visits to the business.  He played the Dragon's Ascent machine at issue each time before ultimately seizing it.

The basic features of the Dragon's Ascent game do not appear to be in dispute.  The game was created to be a game that exclusively relies on skill and has no element of chance.  The game's stated goal is to "[s]hoot dragons to win credits!"  The game features various dragons, all of different colors and sizes, that continuously move across the video screen.  Credits earned by shooting dragons are redeemable for cash.

The machine at issue here has two player stations and one video monitor.  There are versions of Dragon's Ascent where the game is played on a large table with multiple player stations surrounding the table, but that sort of machine is not before us, and, as our standard of review section explains, our review in this case is limited to the individual machine that SLED seized.

Dragon's Ascent always allows a player to access a "Help Screen," even prior to beginning play.  This screen provides extensive instructions on how to play and how to win the game.  Play begins after a player inserts currency into the bill acceptor on the front of the machine and confirms he or she is eighteen years of age.  Initial play "credits" are based on how much money a player deposits into the machine.

A player is represented on the video screen by a turret.  The turret is controlled by a joystick that players use to aim at dragons.  A shot button is then used to fire.  Each shot has a "value" that the player can adjust using a "Shot Cost" feature.  Shot values range from ten cents to two dollars and can be adjusted between shots.

The amount awarded for capturing a dragon is based on the player's shot value and the player's ability to match the color of his or her turret to the color of the targeted dragon. The color of the player's turret changes on a pattern throughout play. For some dragons, rewards range from two times the shot cost to ten times the shot cost, depending on color matching, while other dragons have rewards ranging from fifty times to two hundred fifty times the shot cost. These award amounts or multipliers are disclosed to players in a "Reward Chart" on the Help Screen.

The largest single reward available in the game comes from a particular dragon called the "Rainbow Dragon," but the amount of this reward is not disclosed on the Reward Chart. The reward for the Rainbow Dragon depends on variables such as shot value and the number of shots fired (including shots fired by other players) directly at the dragon. Players may also receive "interim rewards" as the Rainbow Dragon's "health" begins to drain and it becomes more susceptible to capture.

A game session ends when a player's credits run down to zero, or, put differently, when the player loses all of the money deposited into the machine. If a player wishes to end the session before all the credits have run, the player may print a ticket receipt. This receipt is exchangeable for cash.

After the SLED agent seized the machine at issue here, it was taken to the magistrate court, where a magistrate found it to be an illegal gambling device prohibited by the statute. A post-seizure hearing was held several months later.

The magistrate heard extensive arguments, received testimony, and watched as Dragon's Ascent's lead designer demonstrated how to successfully play the game. The magistrate issued a written order finding that the game was one "in which skill predominates over chance," but found that the game was nevertheless illegal because it was used for gambling. The magistrate relied on our supreme court's opinion in *Town of Mount Pleasant v. Chimento*, 401 S.C. 522, 737 S.E.2d 830 (2012) (upholding convictions for playing "Texas Hold'em" in a residence), in concluding that "the determination as to whether th[e] Dragon's Ascent machine is an illegal gambling device is not limited to the skill/chance ratio, but rather on the existence of a wager."

Respondents appealed to the circuit court. As described at the beginning of this opinion, the circuit court agreed with Respondents that an analysis of illegality under the statute "begins and ends" with whether the game is one of skill or one of chance. The circuit court distinguished *Chimento* by reasoning that the case involved a

different statute and did not concern the question whether a particular machine was an illegal gambling device.  This appeal followed.

## STANDARD OF REVIEW

"Section 18-7-170 of the South Carolina Code ([2014]) articulates the standard of review to be applied by the circuit court in an appeal of a magistrate's judgment . . . ." *Bowers v. Thomas*, 373 S.C. 240, 244, 644 S.E.2d 751, 753 (Ct. App. 2007).  The circuit court, as the initial appellate court, must "give judgment according to the justice of the case, without regard to technical errors and defects which do not affect the merits."  § 18-7-170.  "In giving judgment[,] the court may affirm or reverse the judgment of the court below, in whole or in part, as to any or all the parties and for errors of law or fact."  *Id.*

Our review in this posture can be limited if factual findings are involved.  *See Union Cnty. Sheriff's Off. v. Henderson*, 395 S.C. 516, 519, 719 S.E.2d 665, 666 (2011) ("The magistrate's factual findings, confirmed by the circuit court, must be upheld by the appellate court if supported by any evidence.").  But when it comes to questions of law, and particularly questions of statutory interpretation, our review is de novo.  *Town of Summerville v. City of North Charleston*, 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008) ("Determining the proper interpretation of a statute is a question of law, and this [c]ourt reviews questions of law de novo.").

Last, we specify that the case before us deals only with the specific Dragon's Ascent machine found at LG's By the Creek.  *See Mims Amusement Co. v. S.C. L. Enf't Div.*, 366 S.C. 141, 155, 621 S.E.2d 344, 351 (2005) ("[A] magistrate's ruling on legality applies only to the machine before the court."); *id.* ("[T]he legality of a particular machine must be determined on an individual basis at the time of seizure and examination.").

## ANALYSIS

As mentioned before, this appeal turns on a legal question—whether certain language of the relevant statute prohibits only games of chance, or whether it also prohibits machines or devices allowing games of skill to be used for gambling.  The case has this narrow focus because SLED does not challenge the finding that Dragon's Ascent is predominately a game of skill and Respondents have insisted throughout this case that the machine must be deemed legal because the inquiry stops once skill is found to predominate chance.  With that in mind, we turn first to our analysis of the statute's text and history.

**Statutory Construction**

The relevant statute is section 12-21-2710.  The statute is titled "Types of machines and devices prohibited by law; penalties."  S.C. Code Ann. § 12-21-2710 (Supp. 2024).  The statute separately prohibits several different categories of machines and devices, one of which is "device[s] pertaining to games of chance of whatever name or kind," but another of which is "device[s] licensed pursuant to [a different statute] and used for gambling."  *Id*.  In pertinent part, the statute provides:

> It is unlawful for any person to keep on his premises or operate or permit to be kept on his premises or operated within this State . . . any machine or device licensed pursuant to Section 12-21-2720 and used for gambling *or* any punch board, pull board, or other device pertaining to games of chance of whatever name or kind . . . .

*Id.* (emphasis added).  We see our conclusion that these are separate prohibitions as a straightforward application of the rule that we begin (and can often stop) statutory interpretation with the statute's text.  *See Hawkins v. Bruno Yacht Sales, Inc.*, 353 S.C. 31, 39, 577 S.E.2d 202, 207 (2003) ("The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature."); *see also Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) (considering the plain text of a statute "the best evidence of the legislat[ure's] intent or will" and requiring courts to give effect to that language) (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.03 at 94 (5th ed. 1992))).  The statute prohibits coin-operated machines with a free play feature; coin-operated machines used for playing certain games like poker and blackjack; machines and devices used for gambling; and punch boards, pull boards, or other devices pertaining to games of chance.  § 12-21-2710.  If Respondents were correct that the legal definition of "gambling" under this statute is limited to games of chance, there would be no conceivable reason for the clause prohibiting licensed machines used for gambling.

We readily acknowledge that most previous cases evaluating potential gambling devices focused on whether particular games were games of chance.  *See, e.g.*, *S.C. L. Enf't Div. v. 1-Speedmaster S/N 00218*, 397 S.C. 94, 97–100, 723 S.E.2d 809, 811–12 (Ct. App. 2011) (relying on the lack of chance in determining a game did not constitute illegal gambling); *Ward v. W. Oil Co.*, 387 S.C. 268, 272–78, 692 S.E.2d 516, 519–22 (2010) (including an element of chance in its gambling analysis under section 12-21-2170; however, the specific provision applied there was "any

punch board, pull board, or other device *pertaining to games of chance*" (emphasis added)); *Sun Light Prepaid Phonecard Co. v. State*, 360 S.C. 49, 53–56, 600 S.E.2d 61, 63–65 (2004) (same as *Ward*). Even so, our reading of the relevant statute is bolstered by the history of our legislature's "longstanding prohibition against gambling," *Chimento*, 401 S.C. at 538, 737 S.E.2d at 840 (Toal, C.J., concurring), and the fact that the legislature added the "used for gambling" language after the statute already prohibited games of chance. *See Senate by & through Leatherman v. McMaster*, 425 S.C. 315, 322, 821 S.E.2d 908, 912 (2018) ("[Courts] should not concentrate on isolated phrases within [a] statute[, and instead] . . . must read the statute so 'that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous,' for '[t]he General Assembly obviously intended [each provision] to have some efficacy, or the legislature would not have enacted [the statute] into law.'" (quoting *CFRE, L.L.C. v. Greenville Cty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011))).

Since as early as 1816, the General Assembly has expressed its clear disapproval of gambling. *Chimento*, 401 S.C. at 537, 737 S.E.2d at 840 (Toal, C.J., concurring). South Carolina has outlawed gambling devices for decades. *Westside Quik Shop, Inc. v. Stewart*, 341 S.C. 297, 300, 534 S.E.2d 270, 271 (2000), *overruled on other grounds by Byrd v. City of Hartsville*, 365 S.C. 650, 620 S.E.2d 76 (2005).

As time has passed, the General Assembly has progressively broadened what the statute prohibits. In the early 1930s, in what appears to be the first statute outlawing the possession of gambling devices, the General Assembly provided:

> It shall be unlawful for any person to keep on his premises or operate or permit to be kept on his premises or operated within this State, any slot machine of whatever name or kind, except automatic weighing, measuring, musical and vending machines which are so constructed as to give a certain uniform and fair return in value for each coin deposited therein, and in which there is no element of chance.

1932 Code of Laws § 1301-A. In 1942, the legislature extended the list of prohibited devices to include "any vending or slot machine, punch boards[,] pull boards, or other devices pertaining to games of chance of whatever name or kind" while maintaining the exemption for certain games with no element of chance. 1942 Code of Laws § 1301-1(1). Then, in 1999, the statute was amended to specifically prohibit devices allowing individuals to play poker, other specific games, and "any machine

or device . . . used for gambling." Act. No. 125, 1999 S.C. Acts 1322. Thus, for over fifty years prior to the 1999 amendment, the law already prohibited games of chance. *See* § 1301-1(1). The addition of blackjack and poker illustrates a need to prohibit certain specific games, but the language prohibiting machines "used for gambling" can only be understood as broadening the legislature's prohibitions on gambling. It is difficult to understand the addition of this language if those prohibited devices must also "pertain[] to games of chance." That argument is severely undermined by the disjunctive "or" separating *games used for gambling* and *games of chance*. § 12-21-2710.

For these reasons, we conclude the statute does not narrowly prohibit only the listed games and games of chance, but instead includes in its prohibitions any licensed device used for gambling.[1]

### *Chimento* and the Definition of Gambling

While our reading of the relevant statute leads us to the firm conclusion that the statute draws a distinction between games used for gambling and games of chance, the section itself does not include a definition of "gambling." Respondents maintain that in order for a game to constitute gambling, chance must predominate over skill. SLED points us to our supreme court's decision in *Chimento* for a definition of gambling that includes games of skill when something of value is wagered on the outcome. Respondents counter that *Chimento* does not apply here because that case dealt with a different statute, section 16-19-40 of the South Carolina Code (2015), which criminalizes gaming and betting in certain locations.

Though Respondents are correct that the issue in *Chimento* centered around a different statute than the one at issue here, we are not able to reconcile Respondents'

---

[1] The machine at issue here was not licensed, but Respondents conceded to the magistrate that it should have been licensed and claimed it was an inadvertent mistake. As the magistrate found, it would be absurd for a gambling machine to be legal based on the failure to obtain a license for the machine, whether inadvertent or not. *See Lancaster Cnty. Bar Ass'n v. S.C. Comm'n on Indigent Def.*, 380 S.C. 219, 222, 670 S.E.2d 371, 373 (2008) ("In construing a statute, [courts] will reject an interpretation when such an interpretation leads to an absurd result that could not have been intended by the legislature."); *see also* § 12-21-2710 (prohibiting "any machine or device *licensed pursuant to Section 12-21-2720* and used for gambling" (emphasis added)).

argument that *Chimento* does not apply with the analysis and approach our supreme court employed in that case. *Chimento* did not focus solely on section 16-19-40. The court wrote, "The statutory meaning of the word 'gambling' *in South Carolina* includes games in which skill outweighs chance." 401 S.C. at 533, 737 S.E.2d at 837 (emphasis added). The court looked to other statutes and precedent:

> For example, [section] 32-1-10 [of the South Carolina Code] (2007), found in an article captioned "Gambling Contracts," permits persons who have lost money or other thing(s) of value in an amount equal to at least $50 at cards, at a dice table, or "at any other game whatsoever," or by betting on those games, to recover their losses under certain circumstances. The plaintiffs in such a suit are almost uniformly referred to as "gamblers" regardless whether the enterprise was unlawful. *See Berkebile v. Outen*, 311 S.C. 50, 426 S.E.2d 760 (1993).

*Id.* at 532, 737 S.E.2d at 837.

While the court based some of its analysis on the text of section 16-19-40 (the statute at issue there), it nevertheless concluded: "Gambling *as defined in South Carolina* includes betting money on the outcome of any 'game' whatsoever, regardless of the amount of skill involved in the game." *Id.* at 532–33, 737 S.E.2d at 837 (emphasis added) (quoting § 32-1-10). In other words, the court held, "Whether an activity is gaming/gambling is *not dependent upon the relative roles of chance and skill*, but whether there is *money or something of value wagered* on the game's outcome." *Id.* at 533, 737 S.E.2d at 838 (emphases added); *see also, e.g., State v. Red*, 41 S.C.L. (7 Rich.) 8 (1853) ("If the prohibited games be confined to those alone in which the stake is won or lost by chance, the result would follow, that the gambler who relied on the practiced legerdemain of a juggler, whilst he professed that the stake depended on fortune, will escape punishment by playing falsely.").

And while it is true that *Chimento* was not analyzing gambling under section 12-21-2710, it is worth mentioning that section 16-19-40 similarly criminalizes playing "any machine or device licensed . . . and used for gambling purposes . . . ." *Compare* S.C. Code Ann. § 16-19-40(g) (2015) *with* § 12-21-2710 (deeming "any machine or device licensed pursuant to [another section] and used for gambling" unlawful). We construe statutes regarding the same subject with a "harmonious result" in mind. *Joiner ex rel. Rivas v. Rivas*, 342 S.C. 102, 109, 536 S.E.2d 372, 375 (2000). We cannot meaningfully distinguish *Chimento* as relating to a

completely separate statute when the language in that statute has significant overlap with the language in section 12-21-2710.

Respondents point us to this court's decision in *Speedmaster* as support for their argument that gambling must include an element of chance. There, this court relied on the usual evaluation of skill versus chance in determining whether a particular game constituted illegal gambling. *Speedmaster*, 397 S.C. at 97–99, 723 S.E.2d at 811. This court went on to address the parties' dispute over whether the "used for gambling" portion of section 12-21-2710 meant that the statute did not prohibit mere possession of an illegal device but instead required the machine to actually be *in use*. *Id.* at 99, 723 S.E.2d at 811–12. This court concluded that the statute does not specifically require an illegal gaming device be *actually* in use. *Id.* at 100, 723 S.E.2d at 812; *see also State v. 192 Coin-Operated Video Game Machines*, 338 S.C. 176, 188, 525 S.E.2d 872, 879 (2000) ("The plain language of [section 12-21-2710] makes clear the legislature's intent to outlaw *mere possession* of such [unlawful] machines." (emphasis added)). Still, this court wrote that because "gambling necessarily encompasses the element of chance[,]" and the game there was not one of chance, "the circuit court properly affirmed the magistrate's ruling the [game] was not 'used for gambling.'" *Speedmaster*, 397 S.C. at 100, 723 S.E.2d at 812.

To put the point simply, *Chimento* was released over a year after *Speedmaster*, and we believe *Chimento*'s analysis controls. The circuit court here limited *Chimento* because it did not explicitly overrule *Speedmaster* or any other cases, but as described above, we simply cannot read *Chimento* as limiting its conclusions to a single statute. We hasten to add that we do not read *Chimento* as abolishing the skill versus chance analysis; instead, we read *Chimento* as recognizing the common-sense fact that a game of chance *and* a game of skill can both be "used for gambling." This neatly tracks with what we see as the obvious purpose of the language in question, which is to prohibit gaming machines that attract players to deposit money for the purpose of trying to "win" more, whether by skill or chance.

**CONCLUSION**

The circuit court erred in ending its analysis with the skill versus chance inquiry. We therefore reinstate the magistrate's order finding that this Dragon's Ascent machine was used for illegal gambling. We need not address any remaining issues based on the foregoing conclusions. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling it unnecessary for an appellate court to address remaining issues when its resolution of a prior issue is dispositive).

The circuit court's decision is

**REVERSED.**

**THOMAS and VINSON, JJ., concur.**