737 S.E.2d 830

TOWN OF MOUNT PLEASANT, Appellant,

v.

Robert L. CHIMENTO, Scott Richards, Michael Williamson, Jeremy Brestel and John T. Willis, Respondents.

No. 27197.

Supreme Court of South Carolina.

Heard Oct. 19, 2010.

Decided Nov. 21, 2012.

Rehearing Denied Jan. 10, 2013.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Deputy Attorney General Robert D. Cook, Senior Assistant Attorney General C. Havird Jones, Jr., and Assistant Attorney General Mary Frances Jowers, all of Columbia, for Appellant.

Jeffrey Alton Phillips, of Travelers Rest, and William W. Wilkins and Kirsten E. Small, both of Nexsen Pruet, of Greenville, for Respondents.

James W. Sheedy, of Driscoll Sheedy, of Rock Hill, and Thomas C. Goldstein, of Washington, for Amicus Curiae.

Justice PLEICONES.

Respondents were convicted in municipal court of violating S.C.Code Ann. § 16–19–40(a) (2003) which makes it unlawful to "play ... in any house used as a place of gaming ... any game with cards ...." after they were found playing Texas Hold'em and gambling in a residence leased by Nathan Stallings.[1]  On appeal, the circuit court reversed respondents' convictions finding they were entitled to directed verdicts or,

1. Stallings pled guilty to keeping a house used as a place of gaming in violation of § 16–19–40 in a separate proceeding.

alternatively, that § 16–19–40(a) is unconstitutional. We reverse.

## FACTS

Stallings leased a home in Mt. Pleasant where he lived with his fiancé and a roommate. He used an internet social networking site [2] to meet other poker players, and established a regular Sunday night game at his home. He added a regular Wednesday night game after another friend [3] could no longer host those games. People Stallings "met" on this site and their friends were welcome at the games.

Stallings testified that players would buy in to the game for a minimum of $5 and a maximum of $20. They could purchase more chips as needed. Stallings took a "rake" out of the pot in an amount sufficient to cover the cost of the food and drink he provided. If the rake did not cover his expenses, then others (most often the night's winners) would contribute money.

The municipal judge found, based on expert testimony presented by the respondents, that Texas Hold'em is a game of skill. The municipal judge also held that if a game of skill were without the ambit of gaming, then he would acquit the respondents, but that there was no clear indication whether the legislature intended to criminalize only gambling on games of chance. At the hearing, the municipal judge declined to find § 16–19–40 unconstitutional. The circuit court reversed, and the Town appeals that order.

Before this Court, as they did before the lower courts, respondents freely admit they were playing Texas Hold'em, a card game, and do not deny they were betting on this game. All parties agree that the term "gaming" as used in § 16–19–40 is synonymous with gambling.

## ISSUES

1) Whether respondents were entitled to directed verdicts because betting money on a game of skill at a residence is not prohibited by § 16–19–40?

---

**2.** Identified as charlestonpokermeetups.com in the transcript.

**3.** Respondent John Willis.

2) If respondents are not entitled to directed verdicts, should their convictions have been set aside because § 16–19–40(a) is unconstitutional?

## ANALYSIS

### A. Directed Verdict

The circuit court held that respondents were entitled to directed verdicts because it is not unlawful to gamble on a game of skill in a residence. We disagree.

Section 16–19–40 is the "modern" version of a statute first enacted in 1802. In its present form, it reads:

§ 16–19–40. **Unlawful games and betting.**

If any person shall play at any tavern, inn, store for the retailing of spirituous liquors or in any house used as a place of gaming, barn, kitchen, stable or other outhouse, street, highway, open wood, race field or open space at (a) any game with cards or dice, (b) any gaming table, commonly called A, B, C, or E, O, or any gaming table known or distinguished by any other letters or by any figures, (c) any roley-poley table, (d) rouge et noir, (e) any faro bank (f) any other table or bank of the same or the like kind under any denomination whatsoever or (g) any machine or device licensed pursuant to Section 12–21–2720 and used for gambling purposes, except the games of billiards, bowls, backgammon, chess, draughts, or whist when there is no betting on any such game of billiards, bowls, backgammon, chess, draughts, or whist or shall bet on the sides or hands of such as do game, upon being convicted thereof, before any magistrate, shall be imprisoned for a period of not over thirty days or fined not over one hundred dollars, and every person so keeping such tavern, inn, retail store, public place, or house used as a place for gaming or such other house shall, upon being convicted thereof, upon indictment, be imprisoned for a period not exceeding twelve months and forfeit a sum not exceeding two thousand dollars, for each and every offense.

Subsection (g) referencing video games was added in 1999. Prior to that amendment, the statute was last amended in 1909 when the penalty section was changed.[4] The only other

---

4. 1909 S.C. Acts No. 43, § 1 p. 66.

major substantive alteration occurred in 1816, and is discussed in more detail *infra*.

The statute, with its modern punctuation, provides:

(1) Any person who plays or shall bet on the sides or hands of such as do game at any

- tavern
- inn
- store for the retailing of spirituous liquors
- house used as a place of gaming
- barn
- kitchen
- stable
- other outhouse
- street
- highway
- open wood
- race field
- open place

(2) at

    a) any game with cards or dice

    b) 1. any gaming table, commonly called A, B, C, or E, O

       2. any other gaming table known or distinguished by any other letters or by any figures

    c) any roley-poley table

    d) rouge et noir

    e) any faro bank

    f) any other table or bank of the same or like kind under any denomination whatsoever or

    g) any licensed gambling machine or device

    **except at**

- billiards
- bowls
- backgammon
- chess
- draughts or
- whist

when there is no betting on any such game of billiards through whist

(3) shall be guilty

and

(4) every person so keeping such

- tavern
- inn
- retail store
- public place or
- house used as a place for gaming or
- such other house

(5) shall be guilty.

The statute's preamble indicates that as originally enacted, the legislation was designed to prohibit gambling in public places:

No. 1786.  AN ADDITIONAL ACT for the more effectual prevention of gaming.

1802 S.C. Acts No. 1786.

1.  Residence as Place of Gaming

■ The circuit court agreed with respondents that a residence could not qualify as a "house used as a place of gaming" under § 16–19–40.  We disagree.

In 1806, a defendant was convicted of violating the statute after he was indicted for permitting and encouraging persons to play at prohibited games in his dwelling house.  On appeal, the sufficiency of the indictment was challenged on the ground the statute did not use the words "permit and encourage," nor did the indictment allege that the defendant kept his dwelling for gaming purposes or that he allowed gambling on the premises.  The appeal was affirmed without a full opinion, but Justice Brevard dissented.  It appears that all members of the Court were in agreement that a dwelling house could qualify as a "place kept to accommodate gamesters," with Justice Brevard expressing his opinion in dicta that the legislature could not have intended the statute to apply to "a casual game being played in a man's home."  *State v. Brice,* 4 S.C.L. (2 Brev.) 66 (1806).  Thus, a residence used as a place for gambling could be a "public house" under the original language of the statute.

In 1816, the gaming statute was amended to "more effectively ... prevent the pernicious practice of gaming" by adding to the places where the playing of the games and/or gambling were prohibited. Specifically, after the term "store for the retailing [of] spirituous liquors," the phrase "or in any other public house" was stricken and the phrase "or in any house used as a place of gaming, or in any barn, kitchen, stable or other outhouse" substituted. 1816 S.C. Acts No. 2096 p. 26.

In 1823, the Court explained that the legislature's intent in adopting this 1816 amendment was to ensure that gaming in buildings separate from, even if attached to, the "principal or mansion house" were covered by the statute. *State v. Faulkener*, 13 S.C.L. (2 McCord) 438 (1823). A residence could qualify as a prohibited place under the 1802 version of the statute, *Brice, supra*, and the 1816 amendment preserved the inclusion of a residence or "mansion-house" as a prohibited location while expanding the definition to include outbuildings typically found on residential property. *Faulkener, supra*.

In addition to expanding the list of prohibited places, there was another consequence of the 1816 amendment. By altering the prohibition on playing prohibited games from "public house" to "house used as a place of gaming," the legislature effectively adopted the view of Justice Brevard in his *Brice* dissent. What was originally a ban on merely playing these games "in a public house" became a ban on playing on these games in a residence or mansion house only when that house was "used as a place of gaming." Thus, individuals gambling on a casual game in a person's home were no longer subject to prosecution under this statute.

If, however, a dwelling house is being used "as a place of gaming," then all those playing the game, whether or not they are betting on it, and those present and betting, even if not playing, are guilty of violating § 16–19–40. To the extent that respondents argue that a residence or dwelling cannot be a house within the meaning of this statute, their contention is refuted by *Faulkener, supra*, and the plain language of the statute.

Given that the parties agree that gaming and gambling are synonyms, then Stallings's house was undeniably being used

for gambling on the night of the raid. Moreover, there was sufficient evidence to withstand a directed verdict motion in light of Stallings's own testimony regarding the regular Sunday/Wednesday games that his dwelling was "a house used as a place of gaming." *See State v. Lane,* 82 S.C. 144, 63 S.E. 612 (1909) (State need not prove by direct evidence that gambling took place on more than one occasion to prove a house is a "gambling den").

2. Gambling

The circuit court, however, adopted the so-called "American Rule" or "dominant factor doctrine," holding that "gaming" as used in § 16–19–40 applies only to betting on games of chance, and not to betting on games where skill, rather than chance, is the predominant factor. In so doing, the court relied primarily on cases deciding whether a particular scheme was a lottery. *E.g., Johnson v. Phinney,* 218 F.2d 303 (5th Cir. 1955); *Opinion of the Justices,* 795 So.2d 630 (Ala.2001); *Morrow v. State,* 511 P.2d 127 (Alaska 1973).[5] Reliance on the "American Rule" and lottery cases is misplaced, however, as § 16–19–40 criminalizes the playing of certain games and gambling, not a lottery. *Compare* § 16–19–30 (2003) (making it unlawful to sell lottery tickets).

In South Carolina, a lottery is a specific form of gambling, one "in which a large number of tickets are sold and a drawing is held for certain prizes." *Johnson v. Collins*

---

5. Other cases relied upon by respondents are also easily distinguishable. *E.g., People v. Hua,* 24 Misc.3d 1142, 885 N.Y.S.2d 380 (N.Y.Crim.Ct.2009) (relying on statutory definition); *Town of Centerville v. Burns,* 174 Tenn. 435, 126 S.W.2d 322 (1939) (British Rule rather than American Rule). Respondents also cite five cases in brief for the proposition that the test for "gambling" is the American Rule. None of the five cases actually hold this. *Indoor Rec. Enterprises, Inc. v. Douglas,* 194 Neb. 715, 235 N.W.2d 398 (1975) (statute and constitution prohibited gambling on games of chance); *In re Allen,* 59 Cal.2d 5, 27 Cal.Rptr. 168, 377 P.2d 280 (1962) (ordinance prohibited betting on game of chance); *Las Vegas Hacienda, Inc. v. Gibson,* 77 Nev. 25, 359 P.2d 85 (1961) (offering a prize for winning a contest is not gambling); *State v. Stroupe,* 238 N.C. 34, 76 S.E.2d 313 (1953) (statute defines gambling as betting on a game of chance); *D'Orio v. Startup Candy Co.,* 266 P. 1037 (Utah 1928) (statute/constitution prohibit lotteries, games of chance, and gift enterprises); and *Harris v. Missouri Gaming Comm'n,* 869 S.W.2d 58 (Mo.1994) (lotteries forbidden).

*Entertainment Co., Inc.,* 333 S.C. 96, 508 S.E.2d 575 (1998). In *Collins,* the dissenters would have adopted a much broader definition of lottery, and thus would have reached the issue of the role of "chance versus skill" in determining whether a particular scheme was a lottery. The *Collins* dissenters would have held that the "American Rule" applied to distinguish lotteries from non-prohibited games. The fact that most courts hold that a scheme is not a lottery if skill rather than chance predominates does not resolve the question whether, in South Carolina, betting on a card game in which skill rather than chance is the dominant factor is unlawful gaming. *Compare* § 16–19–30 (criminalizing lotteries) with § 16–19–40 (criminalizing gaming).

■ Under the plain language of § 16–19–40, gambling on a game of skill is a violation if that gambling is being done in a prohibited location. The statute specifically lists several games that are exempt from the absolute ban on playing games in prohibited locations: billiards, bowls, backgammon, chess, draughts, and whist. These games all involve skill, yet betting on these games is a crime under the statute. § 16–19–40; *see State v. Yoe,* 76 S.C. 46, 56 S.E. 542 (1907) (statute made it unlawful to play certain games without respect to whether there is betting or not, but other games (i.e. billiards, etc.) are unlawful at those places only if bet upon); *cf. State v. Robinson,* 40 S.C. 553, 18 S.E. 891 (1894) (no error in defining gambling in jury instruction by charging not a crime to throw dice unless betting is involved). A violation of the gaming prohibition of § 16–19–40 does not depend on whether the particular game involves more skill than chance.

The statutory meaning of the word "gambling" in South Carolina includes games in which skill outweighs chance. For example, S.C.Code Ann. § 32–1–10 (2007), found in an article captioned "Gambling Contracts," permits persons who have lost money or other thing(s) of value in an amount equal to at least $50 at cards, at a dice table, or "at any other game whatsoever," or by betting on those games, to recover their losses under certain circumstances. The plaintiffs in such a suit are almost uniformly referred to as "gamblers" regardless whether the enterprise was unlawful. *See Berkebile v. Outen,* 311 S.C. 50, 426 S.E.2d 760 (1993). Gambling as defined in South Carolina includes betting money on the outcome of any

"game" whatsoever, regardless of the amount of skill involved in the game. § 32–1–10.

Finally, there is precedent that indicates § 16–19–40 is concerned with wagering regardless of the skill involved in the game wagered upon. In *State v. Red,* 41 S.C.L. (7 Rich.) 8 (1853), the court rejected appellant's argument that his conduct in running a betting game of "Thimble" or "Thimbles and Balls" was not within § 16–19–40 because he was a "juggler" and his "game" was an exhibition of his dexterity. The Court held appellant's conduct was within the statute's terms "because he kept a bank, and a wager depended on his success or failure." The opinion concluded:

> If the prohibited games be confined to those alone in which the stake is won or lost by chance, the result would follow, that the gambler who relied on the practiced legerdemain of a juggler, whilst he professed that the stake depended on fortune, will escape punishment by playing falsely.

In other words, gambling/gaming depends not on the skill/ chance ratio, but on the wager.

■ We hold that one "games" within the meaning of § 16–19–40 when money is wagered on Texas Hold'em, even though it is a game in which skill predominates. *See Atchison v. Gee,* 15 S.C.L. (4 McCord) 211 (1827) (betting on horse racing is gaming); *State v. O'Neal,* 210 S.C. 305, 42 S.E.2d 523 (1947) (poker is gaming); *State v. White,* 218 S.C. 130, 61 S.E.2d 754 (1950) (room where poker played for money is gambling room); *cf. Allendale County Sheriff's Office v. Two Chess Challenge II,* 361 S.C. 581, 606 S.E.2d 471 (2004) (video game in which player's skill could alter outcome not a "game of chance" within the meaning of that term in § 12–21–2712).

■ Whether an activity is gaming/gambling is not dependent upon the relative roles of chance and skill, but whether there is money or something of value wagered on the game's outcome. The circuit court erred in holding that respondents were entitled to directed verdicts because they were not gaming within the meaning of § 16–19–40.

## B. Constitutionality

The circuit court held that if respondents were not entitled to directed verdicts, their convictions must be set aside be-

cause § 16–19–40 was either unconstitutionally overbroad or void for vagueness. We disagree.

The circuit court held § 16–19–40(a) was unconstitutionally overbroad because it criminalizes all games played with cards or dice "regardless of whether the dominant factor in a particular game is skill or chance." The judge cited *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), for the proposition that a legislative enactment which "makes criminal activities which by modern standards are normally innocent" is overbroad. In *Papachristou*, the United States Supreme Court struck down an archaic vagrancy ordinance because it was void for vagueness, and thus offended due process, and not because it was overbroad. Overbreadth is a challenge predicated on the First Amendment, and cannot be used except where the statute arguably suppresses protected speech or conduct. *State v. Neuman*, 384 S.C. 395, 683 S.E.2d 268 (2009). Section 16–19–40 does not offend the First Amendment.

The circuit court also held that § 16–19–40(a) is void for vagueness because it provides no definition of the term "house used as a place of gaming." As the parties concede, gaming and gambling are synonymous. The term of art "house used as a place of gaming" is meant to distinguish the prohibited place from "a house where people are gaming." As the Court said in 1909, the evidence of keeping a gaming house is determined by the facts and circumstances. *State v. Lane, supra.* In deciding a void-for-vagueness challenge to a statute, the Court must look first to see whether the allegedly unconstitutional statute has been interpreted or limited by prior judicial decisions. *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), *citing Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Here, we have our earlier decisions in *State v. Brice, supra; State v. Faulkener, supra; State v. Lane, supra; see also Stardancer Casino, Inc. v. Stewart*, 347 S.C. 377, 556 S.E.2d 357 (2001) (boat not a public place within meaning of § 16–19–40), all interpreting the statute's allegedly vague terms. Even if we had not heretofore construed the statute so as to answer respondents' vagueness challenge, we could do so here and uphold their convictions.

*See, e.g., State v. Watkins,* 262 S.C. 178, 203 S.E.2d 429 (1973) (construing obscenity statute on remand from the United States Supreme Court and affirming conviction). The circuit court erred in finding § 16–19–40(a) unconstitutionally vague.[6]

Moreover, the evidence showed that Stallings's house was used regularly twice a week for poker games at which there was gambling, and that the games were advertised to interested persons on the website, and open to those individuals and their friends.

One whose conduct clearly falls within the statutory proscription does not have standing to raise a void-for-vagueness challenge. *E.g., State v. Neuman, supra.* We find respondents lack standing to challenge § 16–19–40,[7] but also note that a person of reasonable intelligence would understand the statute to prohibit gambling on a card game at a house where players were invited on a regular basis to engage in this activity, especially where, while not a profit-making commercial activity, the players were required to contribute money to cover the host's expenses.

6. Both the circuit judge and the dissent rely upon the arresting officer's testimony as proof of the statute's vagueness. A statute's constitutionality is judged on an objective, not subjective, basis. *E.g., City of Greenville v. Bane,* 390 S.C. 303, 308, 702 S.E.2d 112, 114 (2010) (issues are whether the statute's terms are "sufficiently defined to give reasonable notice of the prohibited conduct to those who wish to avoid its penalties and to apprise Judge and jury of standards for the determination of guilt"). Moreover, in many cases, it is "up to the police . . . to determine just where [a statutory] line is drawn," for example, where the issue is obscenity, loitering, disturbing the peace, or driving under the influence. The fact that an officer must make a judgment call does not render a statute unconstitutionally vague, any more than does the fact that a determination of guilt ultimately turns on the evidence (i.e., facts and circumstances) adduced at trial.

7. "The constitutionality of a statute must be considered in light of the standing of the party who seeks to raise the question and of its particular application. . . ." *Schneider v. State,* 255 S.C. 594, 596, 180 S.E.2d 340, 341 (1971) (internal citation omitted). Standing is not a separate issue when the constitutionality of a statute is challenged under the due process clause, but is instead the foundation of the inquiry. Since the trial court admittedly ruled on § 16–19–40's constitutionality, it necessarily did so in light of respondents' standing. *Schneider, supra.* Lack of standing ends the inquiry into a criminal statute's vagueness. *E.g., United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).

## CONCLUSION

We find that the circuit court erred in reversing respondents' convictions, and therefore the order on appeal is itself **REVERSED.**

BEATTY, J., concurs.

TOAL, C.J., concurring in a separate opinion.

HEARN, J., dissenting in a separate opinion in which KITTREDGE, J., concurs.

Chief Justice TOAL, concurring.

While I agree wholeheartedly with the constitutional analysis contained in the excellently researched and beautifully written dissenting opinion, because of the unique circumstances of this case, I cannot join in that opinion. For the reasons stated *infra*, I concur in the result reached by the majority that these defendants' convictions must stand, and the circuit court must be reversed.

The dissent is completely correct in its conclusion that section 16–19–40 is void for vagueness because that section fails to give adequate notice of the prohibited conduct and fails to provide law enforcement with the requisite guidance to ensure its fair administration. However, I agree with the majority that these Appellants are foreclosed from challenging the constitutionality of this section because they were engaged in conduct that fell so clearly within the statutory proscription. This was not your penny ante game of poker organized in someone's home, but a regular card game hosted in Stallings's home after advertisements were posted on the Internet to recruit players who paid to participate. Thus, they do not have standing to challenge the statute as vague. *See, e.g., United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (stating "ordinarily '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others'" (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–495, and nn. 6 and 7, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)) (alteration in original)); *State v. Neuman*, 384 S.C. 395, 403, 683 S.E.2d 268, 272 (2009) ("One

to whose conduct the law clearly applies does not have standing to challenge it for vagueness." (quoting *Curtis v. State*, 345 S.C. 557, 572, 549 S.E.2d 591, 598 (2001))).

Furthermore, and perhaps more importantly, we cannot sever the language, "a house used as a place of gaming," from section 16–19–40 without striking the provision in its entirety. "The test for severability is whether the constitutional portion of the statute remains complete in itself, wholly independent of that which is rejected, and if of such a character that it may fairly be presumed the legislature would have passed it independent of that which conflicts with the constitution." *Joytime Distrib. & Amusement Co., Inc. v. State*, 338 S.C. 634, 648–49, 528 S.E.2d 647, 654 (1999) (citations omitted). On the other hand, "[w]hen the residue of an Act, *sans* that portion found to be unconstitutional, is capable of being executed in accordance with the Legislative intent, independent of the rejected portion, the Act as a whole should not be stricken as being in violation of a Constitutional Provision." *Id.* (quoting *Dean v. Timmerman*, 234 S.C. 35, 43, 106 S.E.2d 665, 669 (1959)). Striking "house used as a place of gaming" would render the remaining provisions incomplete, leaving the State powerless to regulate gambling in locations other than those explicitly listed in the statute. Moreover, it is highly unlikely that the legislature would have enacted this statute absent the stricken language, as the legislature amended section 16–19–40 in 1816 to specifically include this language.

In my opinion, striking this language would also open the door wide to *all* heretofore illegal gaming practices in this state, including video poker. *See* S.C.Code Ann. § 16–19–40(g) (proscribing the playing of "any machine or device ... used for gambling purposes"). Because of this very real consequence, I am concerned that striking this critical language from the statute would beget, as elucidated by the General Assembly in 1816 when amending section 16–191–40, the "impoverishment of many people, corruption of the morals and manners of youth, ... the tendency which is vice, misery and crime, as examples in this state have abundantly proven." These dire concerns resonate as much today as they did nearly 200 years ago. I do not need to remind any person of the havoc wreaked upon this State as a result of the "pernicious" practice of video poker. Although there are other

sound provisions outlawing video poker, *see* S.C.Code Ann. §§ 1221–2710, 2712 (2000), I am loathe to strike the critical language from the general ban on gaming in the event that it guts these provisions, and consequently, South Carolina's longstanding prohibition against gambling.

Section 16–19–40 is hopelessly outdated, as it applies to *any* gaming activity (including *all* card games) played in a residential home whether wagering occurs or not. This section expired in usefulness long ago and should not form the basis of a modern anti-gambling statute. Thus, I now charge the legislature to modernize section 16–19–40, as I am inclined to agree with the dissent that this provision is constitutionally infirm. However, for the aforementioned reasons, I join the majority in result only, and would reverse the circuit court under these circumstances.

Justice HEARN, dissenting.

"Poker, *n.* A game said to be played with cards for some purpose to this lexicographer unknown." Ambrose Bierce, *The Devil's Dictionary.* In pursuit of this unknown purpose, Nathan Stallings organized regular semi-weekly poker games at his home in Mount Pleasant, South Carolina. Robert Chimento, Scott Richards, Michael Williamson, Jeremy Brestel, and John Willis (collectively, Respondents) participated in these games and were subsequently arrested during a raid on Stallings' home. Respondents were then convicted of violating Section 16–19–40(a) of the South Carolina Code (2003), which makes it unlawful to "play ... in any house used as a place of gaming ... any game with cards."

Respondents argue the term "any house used as a place of gaming" is unconstitutionally vague. A majority of this Court fails to give adequate consideration to Respondents' challenge and instead disposes of the issues with arguments which are neither preserved for review nor meritorious. There is nothing unique about this case that would justify doing so. For these reasons and the reasons stated below, I dissent.

## FACTUAL/PROCEDURAL BACKGROUND

Stallings used an internet social networking website to meet other poker players in and around Charleston, South Carolina.

Eventually, he established a regular Sunday night game held at his house in neighboring Mount Pleasant and later added Wednesday night games as well. Stallings advertised these games [8] on the same networking website, and all members of the website could view the advertisement. Although Stallings maintained that these games were not open to the public, anyone who was a member of the website or a friend of a member could attend.

Acting on a tip from a confidential informant, Officer Justin Hembree of the Mount Pleasant Police Department set-up surveillance of Stallings' home on a game night. Officer Hembree observed a large number of cars parked outside the house, and participants used the parking lot of a nearby CVS for overflow. Armed with this information, he secured permission to send someone into the house undercover with audio and video recording capabilities and money to gamble. The resulting video revealed exactly what officers expected: a group of people playing poker for money.

Police accordingly secured a search warrant, and seven officers entered Stallings' house during one of the games. Officer Hembree testified that within the home, the officers found approximately twenty people, including Respondents, with cards and money on the table. Based on these observations and Officer Hembree's experience, he believed Stallings' residence was a "house used as a place of gaming." However, he testified that "it has never been the practice of the Mount Pleasant Police Department to focus on four or five guys playing poker." Furthermore, Officer Hembree testified that it was his understanding that "if it's a group of people that randomly meet once every six months or whatever they meet and play a game of poker, that's not a house of gaming. My understanding of the statute is a constant use of one location for the purpose of gaming." He also believed the game needed to be for-profit in order to be gambling. In the end, however, Office Hembree conceded that whether or not a

---

8. These were relatively low-stakes games. The buy-in was between $5 and $20, and the small and big blinds were twenty-five and fifty cents, respectively. Although the total pot at the table could be as high as $200, the average pot was between $5 and $10. Stallings would take a small rake to cover the cost of food and beverages, but he did not make a profit from the games.

location is a house used as a place of gaming depends on the person investigating the claim.

In accordance with his understanding of section 16–19–40(a), Officer Hembree issued citations to Respondents for gambling. The municipal court convicted Respondents of violating the statute,[9] but it declined to find any constitutional defects in section 16–19–40. On appeal to the circuit court, the court reversed the municipal court's application of the statute to Respondents, and alternatively held section 16–19–40 unconstitutionally vague.

## LAW/ANALYSIS

Section 16–19–40(a) criminalizes the "play[ing] . . . in any house used as a place of gaming . . . any game with cards or dice."[10] I agree with the circuit court that the statutory language "any house used as a place of gaming" is unconstitutionally vague. Because this issue would be dispositive, I need not reach the remaining arguments raised on appeal and addressed by the majority.

---

9. Stallings pled guilty to keeping a house used as a place of gaming in violation of section 16–19–40 in a separate proceeding.

10. Section 16–19–40 provides in full,

If any person shall play at any tavern, inn, store for the retailing of spirituous liquors or *in any house used as a place of gaming*, barn, kitchen, stable or other outhouse, street, highway, open wood, race field or open place at (a) any game with cards or dice, (b) any gaming table, commonly called A, B, C, or E, O, or any gaming table known or distinguished by any other letters or by any figures, (c) any roley-poley table, (d) rouge et noir, (e) any faro bank (f) any other table or bank of the same or the like kind under any denomination whatsoever or (g) any machine or device licensed pursuant to Section 12–21–2720 and used for gambling purposes, except the games of billiards, bowls, backgammon, chess, draughts, or whist when there is no betting on any such game of billiards, bowls, backgammon, chess, draughts, or whist or shall bet on the sides or hands of such as do game, upon being convicted thereof, before any magistrate, shall be imprisoned for a period of not over thirty days or fined not over one hundred dollars, and every person so keeping such tavern, inn, retail store, public place, or house used as a place for gaming or such other house shall, upon being convicted thereof, upon indictment, be imprisoned for a period not exceeding twelve months and forfeit a sum not exceeding two thousand dollars, for each and every offense. (emphasis added). Only the italicized words are at issue in this case.

We possess a very limited scope of review in cases involving a constitutional challenge to a statute. *Joytime Distribs. & Amusement Co. v. State,* 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999) (per curiam). "All statutes are presumed constitutional and will, if possible, be construed so as to render them valid." *Last v. MSI Constr. Co.,* 305 S.C. 349, 352, 409 S.E.2d 334, 336 (1991) (citations omitted). "This Court is directed by the constitution, and our precedent, to make every effort to find acts of the General Assembly constitutional." *Joytime Distribs.,* 338 S.C. at 653, 528 S.E.2d at 657. The party seeking to invalidate the statute has the burden of proving beyond a reasonable doubt that the statute violates some provision of the constitution. *State v. White,* 348 S.C. 532, 537, 560 S.E.2d 420, 422 (2002).

"The concept of vagueness or indefiniteness rests on the constitutional principle that procedural due process requires fair notice and proper standards for adjudication." *Curtis v. State,* 345 S.C. 557, 571, 549 S.E.2d 591, 598 (2001). When entertaining a challenge to a criminal statute on the ground that it is void for vagueness, we have less tolerance for vagueness than in the civil context because "the consequences of imprecision are qualitatively less severe" in the latter. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). To survive a vagueness challenge, a statute must satisfy two criteria. First, the statute must provide sufficient notice of the conduct prohibited. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also State v. Houey,* 375 S.C. 106, 119, 651 S.E.2d 314, 321 (2007) (Waller, J., concurring). Second, the statute must also not be written in such a manner as to permit or encourage arbitrary and discriminatory enforcement. *Kolender,* 461 U.S. at 357, 103 S.Ct. 1855; *see also Houey,* 375 S.C. at 119, 651 S.E.2d at 321. If a challenger sufficiently proves the statute fails either prong, then the statute is impermissibly vague. *See Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

The rationale underpinning the first requirement of sufficient notice is "that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss,* 347 U.S. 612, 617,

74 S.Ct. 808, 98 L.Ed. 989 (1954); *see also Huber v. S.C. State Bd. of Physical Therapy Exam'rs*, 316 S.C. 24, 26, 446 S.E.2d 433, 435 (1994) ("The constitutional standard for vagueness is the practical criterion of fair notice to those to whom the law applies."). Due process therefore requires that a penal statute be sufficiently definite in its terms "to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Harriss*, 347 U.S. at 617, 74 S.Ct. 808; *see also City of Beaufort v. Baker*, 315 S.C. 146, 152, 432 S.E.2d 470, 473–74 (1993) ("The concept of vagueness or indefiniteness rests on the constitutional principle that procedural due process requires fair notice . . . .").

The second requirement—that the statute provide officials with clear standards for enforcement—is closely related to the first requirement. If a would-be offender cannot reasonably understand the conduct to be proscribed, then neither would a police officer. *People v. Stuart*, 100 N.Y.2d 412, 765 N.Y.S.2d 1, 797 N.E.2d 28, 34–35 (2003). However, the second requirement is considered a more important aspect of the vagueness doctrine. *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855. "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* (quoting *Smith v. Goguen*, 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)). A vague statute would, therefore, allow police to be "guided not by clear language, but by whim." *Stuart*, 765 N.Y.S.2d 1, 797 N.E.2d at 35. Stated differently, if "arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Nevertheless, the mere fact that it may be difficult to determine whether certain conduct falls within the statute does not render it unconstitutionally vague. *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). Furthermore, simply because a statute contains an undefined term does not automatically make the

statute vague, *Lansdell v. State,* 25 So.3d 1169, 1176 (Ala. Crim.App.2007), and words in the statute may be "measured by common understanding and practices," *see Curtis,* 345 S.C. at 572, 549 S.E.2d at 599.

A statute can be challenged as vague on its face or as applied. An as-applied challenge requires the moving party to show that the statute cannot be constitutionally applied to the defendant under the particular facts of the case. *Chapman v. United States,* 500 U.S. 453, 467–468, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). A facial challenge, on the other hand, is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Thus, if the moving party fails to show that the statute is unconstitutional as applied to him, any facial challenge must necessarily fail because there is at least one circumstance where the statute would constitutionally apply. *Stuart,* 765 N.Y.S.2d 1, 797 N.E.2d at 36; *see also City of Chicago v. Morales,* 527 U.S. 41, 78 n. 1, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Scalia, J., dissenting) ("[A] facial attack, since it requires unconstitutionality in all circumstances, necessarily presumes that the litigant presently before the court would be able to sustain an as-applied challenge.").

I note that there is much confusion as to whether the *Salerno* test for a facial challenge—i.e., the challenger must show the act is unconstitutional in all its applications—is still the proper standard. *See Janklow v. Planned Parenthood, Sioux Falls Clinic,* 517 U.S. 1174, 1178, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Scalia, J., dissenting from the denial of certiorari) (stating the question of *Salerno's* viability "cries out for our review"). *Compare Morales,* 527 U.S. at 55 n. 22, 119 S.Ct. 1849 (plurality) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno . . . .*"), *with id.* at 80, 119 S.Ct. 1849 (Scalia, J., dissenting) ("Unsurprisingly, given the clarity of our general jurisprudence on this point, the Federal Courts of Appeals *all* apply the *Salerno* standard in adjudicating facial challenges."). In fact, the plurality in *Morales* opined the *Salerno* formulation is really one of third-

party standing that cannot be imposed on state courts entertaining facial challenges. *Morales*, 527 U.S. at 55 n. 22, 119 S.Ct. 1849 (plurality). Although various members of the Supreme Court have called the *Salerno* test into question, it appears that *Salerno* is the appropriate framework to use when the challenged law does not infringe upon any constitutionally protected conduct.[11] *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir.2008); *see also Stevens*, 130 S.Ct. at 1587 ("To succeed in a *typical* facial attack, Stevens would have to establish 'that no set of circumstances exist under which [the statute] would be valid.'" (emphasis added)). Because neither party, nor the amicus, argues that gambling is a constitutionally protected activity,[12] *Salerno's* standard applies.

In my opinion, Respondents' challenge fails the first prong of our vagueness analysis. As reasonable, intelligent people, Respondents should have understood the statute prohibited their conduct. It banned playing cards, with betting involved, in a house used as a place of gaming; Respondents participated in bi-weekly, organized poker games at someone's home

---

11. In two recent First Amendment cases, the Supreme Court arguably suggested a different standard for a successful facial challenge, stating that facial challenges will fail if the statute has "'a plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 740 n. 7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring)); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quoting *Glucksberg*, 521 U.S. at 740 n. 7, 117 S.Ct. 2258). *Stevens*, however, was not a "typical" case and noted that "which standard applies in a typical case is a matter of dispute that we need not and do not address." 130 S.Ct. at 1587. *Washington State Grange* recognized the dispute regarding the *Salerno* test but believed the challenged act would survive either standard. 552 U.S. at 449, 128 S.Ct. 1184. Until a majority of the Supreme Court definitively says otherwise, I believe the *Salerno* standard is the correct one to apply in these situations.

12. And rightfully so:

   Of course every activity, even scratching one's head, can be called a "constitutional right" if one means by that term nothing more than the fact that the activity is covered (as all are) by the Equal Protection Clause, so that those who engage in it cannot be singled out without "rational basis." But using the term in that sense utterly impoverishes our constitutional discourse.

   *Morales*, 527 U.S. at 84, 119 S.Ct. 1849 (Scalia, J., dissenting).

with strangers that responded to advertisements on the internet, with a buy-in and the house taking a rake. While I question whether other individuals under different circumstances would have sufficient notice of whether their conduct is proscribed, such as four individuals who play a penny-ante poker or bridge game once per month, it is clear that Respondents were on notice their gambling fell within the ambit of the statute.

A majority of the Court extrapolates from this that Respondents lack standing to raise this issue.[13] While I do not disagree with the majority's view that standing is a threshold determination in any appeal, it is not the province of this Court to inject an entirely new issue into a case after briefing and oral argument have long since been completed. The issue of Respondents' standing to make this constitutional argument was never presented to the circuit court judge, let alone ruled on, and was neither raised in Appellant's brief nor mentioned during oral argument. For the majority to now make this argument *for* the Appellant and to use it as the foundation for a decision in its favor is not only manifestly unfair to Respondents, it is contrary to longstanding principles of appellate jurisprudence. *Georgetown League of Women Voters v. Smith,* 393 S.C. 350, 354 n. 2, 713 S.E.2d 287, 289 n. 2 (2011) (Pleicones) (finding the issue of standing was not before the Court because "this issue was neither raised nor ruled upon below, nor do the parties mention it in their briefs."); *State v. Austin,* 306 S.C. 9, 19, 409 S.E.2d 811, 817 (Ct.App.1991) ("[A]ppellate courts in this state, like well-behaved children, do not speak unless spoken to and do not answer questions they are not asked."). The case relied upon by the majority as supplying an avenue to *sua sponte* reach Respondents' lack

---

**13.** I also believe it is somewhat of a misnomer to deem this question one of "standing." When an individual lacks standing to assert a claim, a court cannot review its merits. Here, however, a determination that a party lacks standing to challenge a vague statute necessarily involves an examination of the merits of his claim. *Compare Harriss,* 347 U.S. at 615, 74 S.Ct. 808 ("The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute."), *with Curtis,* 345 S.C. at 572, 549 S.E.2d at 598 ("One to whose conduct the law clearly applies does not have standing to challenge it for vagueness."). It therefore is not so much that he lacks standing, but that he loses.

of standing merely states a party must, of course, have standing to challenge the constitutionality of a statute; it does not stand for the proposition that cases involving constitutional questions are an exception to our preservation rules for standing. *Cf. In re McCracken*, 346 S.C. 87, 92, 551 S.E.2d 235, 238 (2001) ("A constitutional claim must be raised and ruled upon to be preserved for review."). Even assuming the issue of standing appears somewhere in the record, I know of nothing in our precedents that would permit us to *reverse* on a ground that was not properly argued to us. *See I'On, LLC v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) (holding that an appellate court can rely on any reason "appearing in the record to *affirm* the lower court's judgment" (emphasis added)).

Moreover, even if Respondents do not have standing to claim they lacked notice, the Supreme Court has expressly held that the second prong of the vagueness test is an *independent* ground on which a statute can be found invalid. *Hill*, 530 U.S. at 732, 120 S.Ct. 2480. If notice to the individual always precluded a vagueness challenge, then the second prong could never be independent. It therefore must be analyzed outside of Respondents' own expectations. Thus, any notice they may have had does not bear on whether they are permitted to also claim the statute fails to provide clear standards for enforcement. That they knew they were committing a crime does not lessen the fact their prosecution could have been the result of arbitrary and discriminatory enforcement. Such notice would be of little comfort to Respondents if others who equally should have known they were illegally gambling were not cited because police interpreted the statute differently. *See Morales*, 527 U.S. at 63, 119 S.Ct. 1849 (majority opinion) (stating that the fact "police have adopted internal rules limiting their enforcement to certain designated areas in the city would not provide a defense to a loiterer who might be arrested elsewhere"). I therefore believe there are no impediments to us considering this alternative argument, which the Supreme Court has deemed the more important of the two. *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855.

Even though Respondents should "have known they had it coming," *Morales*, 527 U.S. at 82, 119 S.Ct. 1849 (Scalia, J.,

dissenting), the record shows they were cited for violating section 16–19–40 only because they satisfied the additional criteria imposed by the Mount Pleasant police. In other words, the use of the language "any house used as a place of gaming" in section 16–19–40 fails to establish minimum guidelines to govern law enforcement, thereby permitting arbitrary and discriminatory enforcement. I would accordingly hold that statutory language is unconstitutionally vague.

Turning to the merits of Respondents' challenge, it is necessary to first determine exactly what is prohibited by the challenged language in section 16–1940. Based on my review of the statute, a view with which a majority of this Court agrees, it is not a blanket prohibition of all gaming in the home. When the act was originally passed, it sought to address the many evils that commonly accompany gambling:

quarrels and controversies, the impoverishment of many people and their families, and the ruin of the health and corruption of the morals and manners of youth, who in such places frequently fall in company with lewd, idle, disorderly and dissolute persons, who have no other way of maintaining themselves but by gaming. . . .

1802 Act No. 1786. The General Assembly used nearly identical language when it amended the statute to cover gambling occurring in the home by adding the "any house used as a place of gaming" language. *See* 1816 Act No. 2096. The General Assembly therefore sought to prohibit something far more pernicious and insidious than a penny-ante bridge or poker game on a Tuesday night, even when it expanded enforcement of the ban into the home. Accordingly, a strict reading of the statute encompasses more conduct than the General Assembly originally envisioned and is contrary to its intent. *See McClanahan v. Richland Cnty. Council*, 350 S.C. 433, 438, 567 S.E.2d 240, 242 (2002) ("All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in light of the intended purpose of the statute.").

Thus, whether a person violates this portion of the statute hinges on whether he is actually gambling in a "house used as place of gaming." As the record amply demonstrates, there is

much confusion as to what a "house used as a place of gaming" actually is. Because the statute does not provide any additional language regarding its scope, we are left to divine what is proscribed from these seven words alone. In entertaining a vagueness challenge, we are to give the words in a statute their common meaning. *See Curtis*, 345 S.C. at 572, 549 S.E.2d at 599. Here, however, I do not believe the phrase "house used as a place of gaming" has a common understanding that lends itself to consistent enforcement. The words "used as *a place of gaming* " (emphasis added) connote something more than just a house where people happen to be gaming. Indeed, the arresting officer testified before the municipal judge that "it has never been the practice of Mount Pleasant police to focus on four or five guys playing poker."[14] He further testified, "Based on my understanding of the statute, if it's a group of people that randomly meet once every six months or whatever they meet and they play a game of poker, that's not a house of gaming." The State, which represented the Town on appeal, also conceded at oral argument that the "statute does not encompass the Friday night friendly poker game or the penny-ante bridge game conducted at your house."

Because the statute itself provides no guidance, it was up to police and local governments to determine just where this line is drawn. To that end, Officer Hembree believed that the frequency of the games, the number of players involved, and whether the game was run for a profit all factored into whether individuals were playing in a "house used as a place of gaming." However, none of these criteria appears in the statute, and Officer Hembree's decision to issue Respondents a citation was based on these additional elements imposed simply to ferret out conduct he truly believed violated the statute. Officer Hembree therefore had to take it upon himself to make a policy decision based on his own personal opinions as to what should be covered by the statute. It is

---

14. I mean no disrespect whatsoever to Officer Hembree. He executed a well-planned operation and truthfully testified as to what he and the Town honestly believed the statute covered. His equivocation and inability to definitively state the criteria to prosecute under section 16–19–40 is not the result of his own intent to bend the requirements of the statute, but rather emanates from the statute's own lack of guidance as to what conduct is prohibited.

also clear from Officer Hembree's testimony that had another officer entered Stallings' home, the officer could have come to a different conclusion.

As the Supreme Court noted long ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *United States v. Reese,* 92 U.S. 214, 221, 23 L.Ed. 563 (1875). But that is precisely what was done here. The General Assembly's use of broad language to proscribe a more narrow course of conduct demonstrates the very constitutional infirmity the Supreme Court recognized in *Reese,* where it is now left to the courts and law enforcement personnel to separate prohibited gaming from innocuous conduct without any standards but their own.

The plurality's construction of "any house used as a place of gaming" amply proves this point. In opining this portion of section 16–19–40 does not cover a casual game of poker, the plurality writes, "What was originally a ban on merely playing these games 'in a public house' became a ban on playing these games in a residence or mansion house *only when that house was 'used as a place of gaming.'* " (emphasis added). Thus, it later writes that "[t]he term of art a 'house used as a place of gaming' is meant to distinguish the prohibited place from 'a house where people are gaming.' " I completely agree. However, instead of providing any criteria to aid law enforcement in determining just when a residence is elevated from a "house where people are gaming" to a "house used as a place of gaming," it is able to do no more than simply state it depends on the "facts and circumstances." I do not believe that merely resting this distinction on the particular facts and circumstances cures the infirmities of section 16–19–40. Rather, it only underscores the impermissible vagueness in a statute which leaves the determination of what constitutes a house used as a place of gaming up " 'to the moment-to-moment judgment of the policeman on his beat.' " *See Kolender,* 461 U.S. at 360, 103 S.Ct. 1855 (quoting *Smith,* 415 U.S. at 575, 94 S.Ct. 1242).

"Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned,* 408

U.S. at 110, 92 S.Ct. 2294. However, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams,* 553 U.S. 285, 306, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). What is left undetermined by this text of section 16–19–40 is what constitutes a house used as a place of gaming, and police and local governments had to fill this gap themselves. This will not do, and the decision to prosecute some individuals as opposed to others cannot emanate from law enforcement's imposition of its own additional criteria. Here, Respondents were cited not just for playing poker and betting inside someone's home; they were cited because the meetings were regular, attended by up to twenty people each time, and the house allegedly made a profit. The challenged portion of section 16–19–40 is therefore unconstitutionally vague as applied to Respondents because their arrest and conviction was the result of an ad hoc and subjective application of additional criteria designed to give the guidance section 16–19–40 left wanting.

Turning next to whether the phrase "any house used as a place of gaming" is facially vague, I find persuasive the following passage from Justice Breyer's concurrence in *Morales* concluding an ordinance was facially invalid because it laid too much discretion on police officers:

> The reason *why* the ordinance is invalid explains how that is so. As I have said, I believe the ordinance violates the Constitution because it delegates too much discretion to a police officer to decide whom to order to move on, and in what circumstances. And I see no way to distinguish in the ordinance's terms between one application of that discretion and another. The ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in *every* case. And if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications.

527 U.S. at 71, 119 S.Ct. 1849 (Breyer, J., concurring in part and concurring in the result).

Accordingly, when a statute such as section 16–19–40 or the one at issue in *Morales* grants officers too much discretion, the decision to target a certain individual is based upon the officer's own understanding of what the statute proscribes and not solely upon the language of the statute itself. Therefore, every arrest or citation is the result of the officer's personal exercise of discretion; the individuals he lets be are only granted that relief because he has decided their conduct does not fall within the proscription as he understands it. I agree with Justice Breyer that the inescapable conclusion accordingly is that the statute's application is invalid in every case, rendering it facially unconstitutional. A criminal statute is the place for setting forth with precision what conduct constitutes a crime, and our law does not sanction the idea that police and the prosecution can subjectively vary from the statutory elements and impose their separate criteria. If part of a statute permits such variance, as the one before us today does, that language is unconstitutionally vague.

In writing to hold section 16–19–40 facially void by prohibiting gambling in "any house used as a place of gaming," I am not unmindful of the Supreme Court's admonition that "[f]acial challenges are disfavored." *See Wash. State Grange,* 552 U.S. at 450, 128 S.Ct. 1184; *see also Jansen v. State ex rel. Downing,* 273 Ala. 166, 137 So.2d 47, 50 (1962) ("[S]uch power should be exercised only when a statute is so incomplete, so irreconcilably conflicting, or so vague or indefinite, that it cannot be executed, and the court is unable, by the application of known and accepted rules of construction, to determine, with any reasonable degree of certainty, what the legislature intended."). In my opinion, however, this is one of the rare cases where a statute provides too little guidance to police officers and thereby accords them too much discretion in the statute's enforcement. Therefore, I would find section 16–19–40 "is unconstitutionally vague on its face because it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute." *See Kolender,* 461 U.S. at 361, 103 S.Ct. 1855.

I close by responding to two points made in the Chief Justice's separate concurrence, which ostensibly are why she believes this case is "unique." I disagree that any uncertainty concerning the statute's severability impacts its constitutional-

ity. I know of no authority for this position, and the Chief Justice cites none. To the contrary, we have long held that when an unconstitutional portion of a statute cannot be severed from the rest, the statute as a whole falls. *See, e.g., Fairway Ford, Inc. v. Timmons,* 281 S.C. 57, 314 S.E.2d 322 (1984) ("The rule is that where a part of a statute is unconstitutional, if such part is so connected with the other parts as that they mutually depend upon each other as conditions and considerations for each other, so as to warrant the belief that the Legislature intended them as a whole, and if they cannot be carried into effect, the Legislature would not have passed the residue independently of that which is void, the whole act is void." (quoting *Townsend v. Richland Cnty.,* 190 S.C. 270, 279–80, 2 S.E.2d 777, 781 (1930))). I also disagree that we may not strike as unconstitutionally vague only that portion of the statute—"any house used as a place of gaming"—which was challenged in this case without impacting the balance of the statute.

Finally, I cannot comprehend her concern that if any part of the statute is held unconstitutional, a parade of horribles will ensue, including the resurrection of video poker. The prohibition of video poker is found in Section 12–21–2710 of the South Carolina Code (2000). This is a completely separate section (and title) of the code and makes no reference at all to section 16–19–40. In fact, it is entirely independent and separate from the general gambling prohibitions involved here. Striking section 16–19–40 in whole or in part would have no impact on section 1221–2710.

The Chief Justice's fear that gambling and all its attendant vices would return unabated if we strike down a portion of this statute has no place in the execution of our duty to declare law unconstitutional. The decision to ban gambling and prevent the ills that accompany it rests solely with the General Assembly; but it must do so in a constitutional manner. In my view, we abandon our role as the neutral arbiter of a statute's constitutionality the very moment we decide to save a statute because we like what it does.

## CONCLUSION

For the foregoing reasons, I would affirm the circuit court's holding that the portion of section 16–19–40 prohibiting gam-

bling in "any house used as a place of gaming" is unconstitutionally vague as applied and on its face. While I recognize that doing so would upset the law as it has existed for almost 200 years, when a law is unconstitutional it is our duty to so declare.

KITTREDGE, J., concurs.